### BERKSHIRE CABLEVISION OF RHODE ISLAND, INC.

v.

**Edward F. BURKE, in his capacity as Administrator of the Division of Public Utilities and Carriers, State of Rhode Island.**

Civ. A. No. 82–0537.

United States District Court, D. Rhode Island.

Sept. 15, 1983.

John V. Kenny, Newton, Mass., for plaintiff.

Richard Crowell, Providence, R.I., for defendant.

## OPINION

PETTINE, Senior District Judge.

This case involves important questions concerning the First Amendment rights of cable television operators. At issue is the constitutionality of regulations promulgated by the Rhode Island Division of Public Utilities and Carriers ("DPUC"); the contested features require:

1. the cable television operator to provide, of the total available channels, at least one channel each for access by members of the public, educational institutions and government agencies;

2. the cable television operator to construct an institutional/industrial network which will permit origination and transmission, for a fee, of programming at institutions and public buildings, including schools and religious institutions within the service territory.

The plaintiff, Berkshire Cablevision of Rhode Island, Inc. ("Berkshire"), is an applicant for a certificate to provide cable television service to Newport County, Rhode Island. It seeks a declaration that the regulations are unconstitutional as violative of the First and Fourteenth Amendments to the United States Constitution, and a permanent injunction prohibiting any hearings thereunder.

The defendant Edward Burke, Administrator of the DPUC, is responsible for the regulation of cable television in Rhode Island and is sued in his official capacity.

For the reasons which follow, the injunction and declaration of unconstitutionality are denied.

## I. FACTS

In order to operate a "community antenna television" ("CATV") company [1] in this state it is necessary that a certificate be obtained from DPUC, which is charged with the responsibility of supervising and enforcing rules it is required to promulgate for the regulation of every such CATV operation. R.I.G.L. § 39–19–3 and 6 (1977 reenactment).

On January 30, 1981, after extensive public hearings between November 1980 and January 1981 concerning the regulation of the cable television industry, "Rules Governing Community Antenna Television Systems" were adopted pursuant to the Rhode Island Administrative Procedures Act, R.I. G.L. § 42–35–1 et seq. These rules are the subject of the present controversy.

Under the DPUC regulations the Administrator is authorized to designate CATV Service Areas, § 2.1, and then issue an "Invitation for Applicants" to provide CATV service in these areas. § 3.2(a). Public hearings are held concerning each application. § 3.2(b). If more than one application is received, the hearings are to be comparative in nature and the Administrator awards the CATV franchise to the applicant that is "fit, willing, technically qualified and financially able" to provide CATV service within the designated service area. Id. §§ 3.3(d), 4 and 5.

The Service Area in question here (hereinafter referred to as "Newport County") includes the city of Newport and the towns of Middletown, Portsmouth, Tiverton and Little Compton. On January 29, 1982, Berkshire, together with many others, filed an application to develop and operate a CATV system for Newport County. In July 1982 the Administrator commenced public hearings. On August 16, 1982 Berkshire commenced this suit.

I denied the plaintiff's motion for a temporary restraining order and permitted the hearings to go forward but enjoined the Administrator from awarding the Newport County CATV certificate pending resolution of this case.

Berkshire did not make its presentation to the DPUC because it felt it would be prejudiced by being forced to show how it would comply with regulations which it claims are unconstitutional.

The plaintiff's first challenge attacks Chapter 14 of the regulations, which requires CATV operators to designate and reserve a minimum of seven public access cable television channels. § 14.1(a).[2] The provision in question specifically requires cable operators to make time available for educational, governmental and other purposes. Additionally they must dedicate one of their channels for use by members of the general public on a first-come, first-served nondiscriminatory basis and without charge.[3] Berkshire contends that these

1. "CATV", or "community antenna television", refers to systems that receive television broadcast signals and transmit them by wire to subscribers. *See United States v. Southwestern Cable Co.,* 392 U.S. 157, 161, 88 S.Ct. 1994, 1996, 20 L.Ed.2d 1001 (1968). "Cable television" is a broader term that refers to systems capable not only of re-transmitting television broadcast signals but also of transmitting a variety of programming from non-broadcast sources made possible by satellite delivery systems as well as programming originated in their own studios. R.I.G.L. § 39–1–1 defines "CATV" as including "a cable television system which receives video or audio signals, electrical impulses, or currents at a central antenna . . . and from which it distributes or transmits such signals . . . ." The statutory definition of "CATV" is thus broad enough to include "cable television", and the two terms are interchangeable throughout this opinion.

2. Originally the plaintiff also attacked those portions of the regulations dealing with obscene material and the servicing of a U.S. Navy Installation located in Newport. The parties agree these contentions are no longer part of this case and need not be discussed.

3. Section 14.1 of the Rules Governing Community Antenna Television Systems, in part, provides:

Every CATV system operator shall make available to all of its residential subscribers who receive all or any part of the total services offered on the system at least one access channel in each of the categories in sub paragraphs (1), (2), (3) herein. The remaining channels reserved for access purposes shall be apportioned and designated in response to demonstrated community need.

Channels reserved for access purposes shall be designated as one of the following:

mandatory access regulations violate the First Amendment by stripping cable operators of editorial control of their channels and deprives them of their property in violation of the Fourteenth Amendment.

## A. DISCUSSION

This evolving area of the law concerning cable television operation evokes provocative and difficult First Amendment issues. It is a new medium and the differences in its characteristics justify differences in applicable First Amendment standards. *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 386, 89 S.Ct. 1794, 1804, 23 L.Ed.2d 371 (1969). *See F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 748, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073 (1978). Although cable television operators are undoubtedly engaged in some forms of speech protected by the First Amendment, *F.C.C. v. Midwest Video*, 440 U.S. 689, 707, 99 S.Ct. 1435, 1445, 59 L.Ed.2d 692 (1979); *Omega Satellite Products v. City of Indianapolis*, 694 F.2d 119, 127 (7th Cir.1982), the extent of this protection has not as yet been clearly defined. In our pursuit of answers we seek guidance by analogizing to other areas such as newspaper and broadcast journalism where First Amendment concerns have already been addressed. I will discuss each of these areas separately.

(1) *Public:* Public access channels shall be made available for use by members of the general public on a first-come, first-served nondiscriminatory basis. The VHF spectrum shall be used for at least one of these channels;

(2) *Educational:* Educational access channels shall be made available for use by local educational authorities and institutions (including, but not limited to, school departments, colleges and universities but excluding commercial educational enterprises);

(3) *Government:* Government access channels shall be made available for use by municipal and state government;

(4) *"Other":* Other designations for access channels may include (but need not be limited to) religious, cultural, ethnic heritage, and library access.

(5) *Leased:* Leased access channels shall be made available on a first-come, first-served nondiscriminatory basis.

## 1. Regulation of Broadcast Television

Government regulation of the broadcast industry began in 1927 with the creation of the Federal Radio Commission Radio Act of 1927, ch. 169, 44 Stat. 1162 (repealed 1934). The Radio Commission was replaced by the Federal Communications Commission (F.C.C.) in 1934. Communications Act of 1934, ch. 652, 48 Stat. 1064 (currently codified at 47 U.S.C. §§ 151–757 (1976 & 1983 Supp.)). Since 1934 the F.C.C. has regulated the nation's broadcast frequencies through the issuance of renewable licenses. 47 U.S.C. § 307 (1976 & 1983 Supp.). *See Red Lion, supra,* 395 U.S. at 379–80, 89 S.Ct. at 1800–01.

In the broad overview, to be discussed specifically *infra,* we see the government controlling broadcast communication because the paramount right of the viewers and listeners of this limited medium mandates that it not be monopolized by a single point of view. We also see a refusal to recognize any inherent right to guaranteed paid editorial access, at least in the absence of the establishment of such right by Congress, and the appropriateness of access regulations to make time available to legally qualified candidates for federal office.

The F.C.C.'s power to issue broadcast licenses was first challenged as an abridgement of free speech in *National Broadcasting Co. v. United States,* 319 U.S. 190, 63

The minimum number of specially designated access channels required by the above paragraph shall be made available immediately upon commencement of residential subscriber service.

Section 14 further provides that in the event that the Service Area Citizen's Advisory Committee, a citizens' group appointed by the Administrator to advise cable operators about community needs and concerns, *id.* § 15.1, determines that any of the specially designated access channels are in use for eight hours a day for a three-month period, then the cable operator shall make an additional similarly designated channel available. *Id.* § 14.1(d). On the other hand, if there is insufficient demand for seven public access channels, access programming can be combined on one or more channels. *Id.* § 14.1(e).

S.Ct. 997, 87 L.Ed. 1344 (1943). In that case, the Supreme Court rejected the claim that the right of free speech includes the right to use radio frequencies without a license. *Id.* at 227, 63 S.Ct. at 1014. It observed that "the radio spectrum simply is not large enough to accommodate everybody. There is a fixed natural limitation upon the number of stations that can operate without interfering with one another." *Id.* at 213, 63 S.Ct. at 1008. The Court concluded that the Commission's control over broadcast licenses was necessary to eliminate the "chaos and confusion" that had resulted from unregulated competition for use of the nation's airwaves.

Then in *Red Lion, supra,* the Supreme Court again relied upon the scarcity of broadcast frequencies when it upheld the constitutionality of F.C.C. regulations known as the fairness doctrine.[4] The broadcasters in *Red Lion* argued that the fairness doctrine violated the First Amendment because it interfered with their editorial control over the content of their broadcasts:

> [T]he First Amendment protects their desire to use their allotted frequencies continuously to broadcast whatever they choose, and to exclude whomever they choose from ever using that frequency. No man may be prevented from saying or publishing what he thinks, or from refusing in his speech or other utterances to give equal weight to the views of his opponents. This right, they say, applies equally to broadcasters.

*Id.,* 395 U.S. at 386, 89 S.Ct. at 1804.

The Supreme Court, however, completely rejected the broadcasters' claim that the First Amendment prohibited any interference with their selection of programming. The Court reasoned that

> [b]ecause of the scarcity of radio frequencies, the Government is permitted to put restraints on licensees in favor of others whose views should be expressed on this unique medium. But the people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment. It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.

*Id.,* 395 U.S. at 390, 89 S.Ct. at 1806. The *Red Lion* Court emphasized that the public's right to receive information was entitled to greater First Amendment protection than broadcasters' rights to monopolize the airwaves.

> Otherwise, station owners and a few networks would have unfettered power to make time available only to the highest bidders, to communicate only their own views on public issues, people and candidates, and to permit on the air only those with whom they agreed. There is no sanctuary in the First Amendment for unlimited private censorship operating in a medium not open to all.... [T]he First Amendment confers no right on licensees to prevent others from broadcasting on "their" frequencies and no right to an unconditional monopoly of a scarce resource which the Government has denied others the right to use.

*Id.* at 390–91, 89 S.Ct. at 1806–07.

The government's power to regulate broadcasting, however, is not without limit. For example, in *Columbia Broadcasting Systems, Inc. v. Democratic National Com-*

---

4. The fairness doctrine imposes three separate requirements on broadcasters. First, whenever a broadcaster attacks the integrity of an individual involved in public debate, it must provide an opportunity to respond to an appropriate spokesman. *Red Lion,* 395 U.S. at 378, 89 S.Ct. at 1800. Second, when a broadcaster endorses a political candidate, the other candidates must be offered reply time. *Id.* Finally, the fairness doctrine requires broadcasters to provide fair and adequate coverage of differing viewpoints on issues of public importance. *Id.*

For components of the fairness doctrine, *see Straus Communications, Inc. v. F.C.C.,* 530 F.2d 1001, 1007 (D.C.Cir.1976), 47 U.S.C. § 315(a) (1976) (equal time rule), 47 C.F.R. § 73–1920(a) (1982), 47 C.F.R. § 76–209 (1982) (applicability of the rule to cable television operators), 47 C.F.R. § 72–205 (1982) (applicability to cable television operators). *See also Columbia Broadcasting Systems, Inc. v. Democratic National Committee,* 412 U.S. 94, 111 n. 8, 93 S.Ct. 2080, 2090 n. 8, 36 L.Ed.2d 772 (1973).

*mittee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), the Supreme Court sustained the F.C.C.'s ruling that the First Amendment does not require broadcasters to accept paid editorial advertisements. And in *CBS, Inc. v. F.C.C.,* 453 U.S. 367, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981), it upheld the requirement that broadcast stations make time available to legally qualified candidates for federal elective office.

In *Columbia Broadcasting Systems, Inc., supra,* the Court found that a guaranteed right of access would interfere with the editorial discretion of broadcasters, 412 U.S. at 124–25, 93 S.Ct. at 2097, and require undue government supervision of the content of broadcast discussion of public issues. *Id.* at 126–27, 93 S.Ct. at 2098–99. The Court concluded, moreover, that a guaranteed right of paid editorial access would actually further the interest of the more affluent and effectively prevent the presentation of a broader range of ideas. *Id.* at 123, 93 S.Ct. at 2096.

In *CBS, Inc. v. F.C.C., supra,* the Court held that requiring this limited right of access (for candidates for federal office) did not impinge on the First Amendment right of broadcasters. While the Court recognized that the First Amendment guarantees the broadcast industry "the widest journalistic freedom consistent with its public [duties]," 453 U.S. at 395, 101 S.Ct. at 2829 (quoting *Columbia Broadcasting Systems, Inc.,* 412 U.S. at 110, 93 S.Ct. at 2090), it concluded that "the *statutory* right of access ... properly balances the First Amendment rights of federal candidates, the public and broadcasters." 453 U.S. at 397, 101 S.Ct. at 2830 (emphasis added). Access regulation is appropriate, the Court observed that:

> [it] *is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.* It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market .... It is the right of the public to receive suitable access to social, politi-

cal, esthetic, moral, and other ideas and experiences which is crucial here.

> *Id.* at 395 [101 S.Ct. at 2829] (quoting *Red Lion,* 395 U.S. at 390 [101 S.Ct. at 2827]) (emphasis added in *Columbia Broadcasting Systems, Inc.*)

2. Regulation of Newspapers

The blanket prohibition against access requirements to newspapers is well established. In *Miami Publishing Co. v. Tornillo,* 418 U.S. 241, 259, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974), the Supreme Court struck down a Florida statute requiring any newspaper that printed an editorial attack on a political candidate's personal character or official record to provide that candidate the opportunity to reply without charge. The Court stated:

> [T]he Florida statute fails to clear the barriers of the First Amendment because of its intrusion into the function of editors. A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

> *Id.* at 258, 94 S.Ct. at 2840.

The fact that the newspaper industry had become a highly monopolized field in which entry was economically almost impossible did not justify the right-of-access statute. The Court noted that the statute "exacts a penalty on the basis of the content of a newspaper." *Id.* at 256, 94 S.Ct. at 2839. Newspapers covering certain news or commentary would be compelled to print a reply. The Court concluded that the statute would ultimately dampen public debate because newspapers would avoid coverage of controversial events to avoid triggering the

right-to-reply statute. *Id.* at 257, 94 S.Ct. at 2839.

### 3. The Regulation of Cable Television

The history of federal regulation of CATV is a somewhat troubled one, despite its relative brevity.[5] The instant case is by no means the first challenge to access requirements for cable television systems.

■ In May 1976 the F.C.C. promulgated rules requiring cable television operators with over 3,500 subscribers to provide public access to its channels.[6] These rules were

5. The Communications Act of 1934 gives the F.C.C. authority to regulate "interstate ... communication by wire and radio" conducted by common carriers or broadcasters. *See* 47 U.S.C. §§ 151–52 (1976). Until the early 1960's, the Commission had concluded that it lacked authority to regulate cable television. It had reasoned that cable operators were neither "broadcasters" nor "common carriers" within the meaning of the Act. *See United States v. Southwestern Cable Co.,* 392 U.S. 157, 164, 88 S.Ct. 1944, 1998, 20 L.Ed.2d 1001 (1968); *CATV and TV Repeater Services,* 26 F.C.C. 403, 427–28 (1959). It had found, moreover, that cable television could not be regulated on the basis of its potentially adverse effect on broadcast television since such adverse effects had not yet been established. *See Southwestern Cable Co., supra,* 392 U.S. at 164, 88 S.Ct. at 1998.

In 1962 the F.C.C.'s hands-off policy was abandoned. The Commission recognized that it did not have plenary authority over cable television but found that some regulation was necessary to ameliorate the competitive impact of cable television on local broadcast television. The Commission imposed two separate requirements on cable television operators. First, they were required to carry the signals of local broadcast stations in service areas in which they brought competing signals. *First Report and Order,* 38 F.C.C. 683, 716–19 (1965). Second, cable operators were forbidden to duplicate the programming of such local stations for periods of 15 days before and after a local broadcast. *Id.* at 719–30.

The Commission's jurisdiction to regulate cable television was challenged in *Southwestern Cable Co., supra.* The Supreme Court sustained the F.C.C.'s authority to adopt cable regulations on the ground that they were "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." *Id.* at 178, 88 S.Ct. at 2005. The Court reasoned that the F.C.C. would be able to achieve its statutory responsibility for the orderly development of an adequate system of local television broadcasting only if it was also permitted to regulate the growing cable industry. *Id.* at 173–78, 88 S.Ct. at 2003–05.

Soon after the Supreme Court's decision in *Southwestern Cable,* the F.C.C. proposed additional rules governing cable television. The Commission stated that its "concern with 'CATV' carriage of broadcast signals [was] not just a matter of avoidance of adverse effects, but extend[ed] also to requiring 'CATV' affirmatively to further statutory policies." *Notice of Proposed Rulemaking and Notice of Inquiry,* 15 F.C.C.2d 417, 422 (1968). The F.C.C.'s view as to its own jurisdiction had thus expanded considerably; it now sought to regulate cable television not merely because of its ancillary effect on broadcast television, but also to further the public interest. In an attempt to expand the uses of cable television, the Commission promulgated local origination rules, which required CATV systems with more than 3,500 subscribers to make available facilities for local production and presentation of programs. *See* 47 C.F.R. § 74.1111(a) (1970).

In *United States v. Midwest Video Corp.,* 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972) (*Midwest Video I*), the Supreme Court upheld the F.C.C.'s local origination rules. The Court found that these regulations satisfied *Southwestern Cable's* requirement of being "reasonably ancillary" to the Commission's responsibility to regulate broadcast television. *Id.* at 670, 92 S.Ct. at 1872. Justice Brennan, speaking for four members of the Court, concluded that the regulations could "further the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services ...." *Id.* at 667–68, 92 S.Ct. at 1870–71 (quoting *First Report and Order,* 20 F.C.C.2d 201, 202 (1969)). Chief Justice Burger concurred in the result, but noted that the F.C.C. rules "strain[ed] the outer limits" of its jurisdiction. *Id.* at 676, 92 S.Ct. at 1874 (Burger, C.J., concurring).

6. These rules required cable operators to designate four of their channels for certain specified uses: leased access, educational purposes, local government purposes, and public access on a nondiscriminatory first-come, first-served basis. *See* 47 C.F.R. §§ 76.254–256 (1976). If there was insufficient demand for all four channels, the cable operator was permitted to combine one or more channels. *Id.* § 47.254(b). Cable operators were specifically forbidden from exercising any control over the content of access programming except that they were required to adopt rules proscribing the transmission of commercial or obscene material. *Id.* §§ 76.256(b), (d).

The F.C.C. concluded that access channels would serve the public interest since they would

challenged before the Court of Appeals for the Eighth Circuit in *Midwest Video Corp. v. F.C.C.*, 571 F.2d 1025 (8th Cir.1978), *aff'd*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) (*Midwest Video II*). The Eighth Circuit held that the F.C.C. lacked statutory authority[7] to promulgate public access rules for cable television. *Id.* at 1052. The Court found that the regulations were not "reasonably ancillary" to the F.C.C.'s jurisdiction over broadcast television. *Id.* at 1050. The regulations, moreover, violated section 3(h) of the Communications Act of 1934, 47 U.S.C. § 153(h) (1976), by imposing common carrier obligations on cable operators engaged in broadcasting. *Id.* at 1050–52.

Although it was unnecessary to its disposition of the case, the Eighth Circuit also addressed the constitutionality of the public access requirements. The court found that "[t]he present access rules strip from cable operators, on four of their channels, all rights of material selection, editorial judgment, and discretion enjoyed by other private communications media . . . ." *Id.* at 1055–56. Because the court concluded that cable operators are entitled to the same First Amendment protection as newspapers, it stated that compelled access to cable facilities impermissibly infringed on a cable operator's right to control its own programming. *Id.* at 1056. The court's reasoning was based largely on the Supreme Court's holding in *Tornillo* that the First Amendment prohibits compelled access to a newspaper. The Eighth Circuit stated: "Despite the Court's guidance in [*Tornillo*], *supra*, the Commission has attempted here to require cable operators, who have invested substantially to create a private electronic 'publication'—a means of disseminating information—, to open their 'publications' to all for use as they wish." *Id.*

The Eighth Circuit distinguished the mandatory access rules from the mandatory program origination rules upheld in *Midwest Video I. See* note 5 *supra*. The local origination rule in the earlier case required cable operators merely to make available their production facilities for local programming. The cable operator retained ultimate control over who used his facilities and which programs he would actually air. *Id.* at 1055. Under the mandatory access rules, however, the cable operator could "choose neither user nor material." *Id.*

The Eighth Circuit also found that the scarcity rationale relied upon by the Supreme Court in *Red Lion* and *CBS, Inc. v. F.C.C.* to uphold limited rights of compelled access to broadcast television was not applicable to cable television. " '[S]carcity which is the result solely of economic conditions is apparently insufficient to justify even limited government intrusion into the First Amendment rights of the conventional press . . . , and there is nothing in the

---

if properly used, result in the opening of new outlets for local expression, aid in the promotion of diversity in television programming, act in some measure to restore a sense of community to cable subscribers and a sense of openness and participation to the video medium, aid in the functioning of democratic institutions, and improve the informational and educational communications resources of cable television communities.
*1976 Report and Order*, 59 F.C.C.2d 294, 296 (1976).

7. Berkshire also argues that the Administrator lacks statutory authority to promulgate the challenged regulations. This argument is without merit. R.I.G.L. § 39–19–6 specifically gives the Administrator authority to promulgate and enforce regulations to prevent the operation of cable companies from "having detrimental consequences to the public interest." By ensuring that members of the community have access to cable television as well as the institutional network, the DPUC regulations are intended to prevent the detrimental consequences of allowing cable television operators to monopolize cable television time. The Court thus concludes that the challenged regulations are within the Administrator's statutory authority to regulate cable television in "the public interest."

This is simply not a case like *Midwest Video II* in which the administrator's authority over cable television derives from his authority to regulate broadcast television. Congress gave the F.C.C. no statutory authority to regulate CATV. Here the Rhode Island legislators specifically authorized the Administrator to regulate cable television in and out of itself. Unlike the Eighth Circuit, which would have found such statutory authority unconstitutional, I find to the contrary.

record before us to suggest a constitutional distinction between cable television and newspapers on this point.'" *Id.* at 1055 (quoting *Home Box Office, Inc. v. F.C.C.,* 567 F.2d 9, 46 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)).

The Supreme Court affirmed the Eighth Circuit's decision that the F.C.C. lacked statutory authority to promulgate mandatory access regulations for cable television. *Midwest Video II,* 440 U.S. 689, 709, 99 S.Ct. 1435, 1446, 59 L.Ed.2d 692 (1979). The Court did not, however, address the question of whether the First Amendment prohibits such regulations "save to acknowledge that it is not frivolous and to make clear that the asserted constitutional issue did not determine or sharply influence [its] construction of the statute." *Id.* at n. 19.

With all due deference to the Eighth and District of Columbia Circuits, I respectfully disagree with their analysis of the constitutionality of the access requirements for cable television systems. Newspapers and cable television cannot be equated. More to the point, the two media *are* constitutionally distinguishable. Although a cable operator's selection of its programming is similar to the editorial function of a newspaper publisher or a television broadcaster, this similarity does not mean that each medium is entitled to the same measure of First Amendment protection. "Each method of communicating ideas is a 'law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers of each method.'" *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981) (quoting *Kovacs v. Cooper,* 336 U.S. 77, 97, 69 S.Ct. 448, 459, 93 L.Ed. 513 (1949)).

CATV and newspapers first differ in that only the latter have historically operated virtually free from any form of government control over their content.[8] As Justice White noted in his concurrence in *Miami Herald Publishing Co. v. Tornillo:* "According to our accepted jurisprudence, the First Amendment erects a virtually insurmountable barrier between government and the print media so far as government tampering, in advance of publication, with news and editorial content is concerned." 418 U.S. at 259, 94 S.Ct. at 2840 (White, J., concurring) (citations omitted). It was in this historical setting that the *Tornillo* court struck down the Florida right-of-access law.[9]

Cable television does not have a similar history of freedom from government regulation over either its operations or the content of its programming. *See Community Communications v. City of Boulder, Colorado,* 660 F.2d 1370, 1378 n. 9, 1379 (10th Cir.1981), *petition for cert. dismissed,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982). Indeed, government franchising of the cable television industry is virtually indispensable. For example, since constructing a cable television system requires use of the public streets or telephone poles, the government has a substantial interest in limiting the number of cable operators who build cable systems. *See Omega Satellite Products v. City of Indianapolis, supra,* 694 F.2d at 127; *Community Communications, supra,* 660 F.2d at 1377–78.

Of course, the flip side to government franchising is that it insulates cable operators from unnecessary competition. The award of a franchise serves as a rational way of choosing which cable operator will provide cable television service within a

---

**8.** Newspapers are subject, however, to antitrust laws, *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), labor laws, *Associated Press v. NLRB,* 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937), and "ordinary forms of taxation." *Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936).

**9.** As already stated, the proscription against a right of access applies uniquely to newspapers. It was not extended by the Supreme Court to a privately owned shopping center in *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), because there was no danger, as in *Tornillo,* that such a mandate would "'dampe[n] the vigor and limi[t] the variety of public debate' by deterring editors from publishing controversial political statements that might trigger the application of the statute." *Id.* at 88, 100 S.Ct. at 2044 (quoting *Tornillo,* 418 U.S. at 257, 94 S.Ct. at 2839).

particular service area. Cable operators often compete for a cable franchise but very rarely develop competing cable systems for the same service area. Such a franchising system recognizes the economic realities of the cable industry, which, as a practical matter, create a "natural monopoly" for the first cable operator to construct a cable system in a given service area. Testimony in this case established that to construct the Newport County cable system would cost approximately seven million dollars. Because of these start-up costs and the nature of the cable television market, *see* Meyerson, the First Amendment and the Cable Television Operator, 4 COMM/ENT L.J. 1, 4–6 (19  ), cable systems have operated largely free from competition. *See Omega Satellite Products v. City of Indianapolis, supra,* 694 F.2d at 127–28; Cabinet Committee on Cable Communications, Report to the President, CABLE at 10 (1974); *First Report and Order,* 20 F.C.C.2d 201, 222 n. 27 (1969).

Despite these fundamental differences between cable television and newspapers (CATV's use of the public right-of-way and its ease of monopolization), on the basis of the Supreme Court's *Tornillo* decision both the D.C. Circuit in *Home Box Office* and the Eighth Circuit in *Midwest Video II,* as explained above, rejected "scarcity which is the result solely of economic conditions" as a rationale for content regulation of CATV systems. However, the Tenth Circuit's more recent opinion in *Community Communications, supra,* reflects an unwillingness to incorporate *Tornillo* wholesale into the cable television context. As that opinion stated, the "cable broadcasting medium presents very different circumstances" from those before the Supreme Court in *Tornillo. Community Communications,* 660 F.2d at 1379. In *Community Communications* the appellant City of Boulder had argued that because a cable operator has a natural monopoly for his franchise area, "the cable broadcasting medium [is] 'scarce' in much the same way that the finiteness of the electromagnetic spectrum makes wireless broadcasting a medium of essentially limited access." *Id.* at 1378. Although not

explicitly adopting the City's reasoning, the court did agree that "natural monopoly *is* a constitutionally permissible justification for some degree of regulation of cable operators," although the court warned that this conclusion did "not mean that the full panoply of principles governing the regulation of wireless broadcasters necessarily applies to cable operators." *Id.* at 1379 (emphasis added).

Clearly, then, one basic issue in the instant case is whether or not economic "scarcity" is a constitutionally sufficient rationale for the regulation of cable television. It is the opinion of this court that the Tenth Circuit has developed the more sensible approach to the question. While it is true that the Supreme Court has rejected economic scarcity as a basis for the regulation of newspapers, the lack of any access requirement for newspapers simply does not prevent a member of the general public from expressing his opinions *in that same medium,* which in such a case is print, of course. Any person may distribute a written message in the form of a leaflet, pamphlet, or other relatively inexpensive form of "publication." In contrast, a resident of Newport County who does not have seven million dollars to develop his own cable system is shut out of that medium with no way to express his ideas with the widely acknowledged power of the small screen. Quite frankly, I am unwilling to say that the Supreme Court would ignore this distinction were the issue to come before it.

The result is that *Red Lion,* the seminal case of contemporary communications law, retains its vitality in the high-tech world of cable television. To be sure, the scarcity rationale for governmental regulation here takes a somewhat different form, but the goal remains the same as in 1969: to *promote* the First Amendment by making a powerful communications medium available to as many of our citizens as is reasonably possible. For this court, at least, scarcity is scarcity—its particular source, whether

"physical" or "economic," [10] does not matter if its effect is to remove from all but a small group an important means of expressing ideas.

■ The Court thus finds that cable operators' editorial control over their channels is not immune from government regulation. Since Rhode Island's mandatory access rules do to some extent limit cable operators' ability to exercise their First Amendment rights, however, we must carefully scrutinize these regulations aimed at the control of speech to ensure that the operators are not being regulated " 'merely because public officials disapprove the speaker's views.' " *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980) (quoting *Niemotko v. Maryland,* 340 U.S. 268, 282, 71 S.Ct. 325, 333, 95 L.Ed. 267 (1951) (Frankfurter, J., concurring in result)).

■ One should note, however, that the Supreme Court has examined content regulation with less exacting scrutiny under certain circumstances. For example, a regulation that is content-neutral is more likely to survive constitutional scrutiny. Also, the government may enforce time, place and manner regulations of expression which are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Perry Education Assn. v. Perry Local Educators' Assn.,* —— U.S. ——, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 647, 652, 101 S.Ct. 2559, 2563, 2566, 69 L.Ed.2d 298 (1981). Furthermore, the government may adopt regulations that are not aimed at communicative activity but involve only incidental restrictions on First Amendment liberties. *See Procunier v. Martinez,* 416 U.S. 396, 411–12, 94 S.Ct. 1800, 1810–11, 40 L.Ed.2d 224 (1974). These latter restrictions pass consti-

tutional muster only if they further substantial governmental interests and if the incidental restriction on free expression is no greater than is essential to the furtherance of that interest. *Id.* at 410–15, 94 S.Ct. at 1810–12; *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). The right to regulate cable television being clear, as I see it, the question remains whether the Rhode Island rules survive this test.

■ Rhode Island's mandatory access rules are content-neutral. The regulations mandate that all individuals be given the opportunity to appear on cable television on a nondiscriminatory first-come, first-served basis. *See* Rules Governing Community Antenna Television Systems § 14.1(b). While the access regulations are not intended to restrict the free speech rights of cable operators, their incidental effect is to limit cable operators' editorial control over their channels. Accordingly, the Court concludes the regulations must be examined under the test enunciated in *United States v. O'Brien, supra. See Home Box Office, supra,* 567 F.2d at 48.

■ The mandatory access requirements serve substantial governmental interests. The regulations are intended to assure community participation in cable television production and programming. It has been noted that "[i]f cable is to become a constructive force in our national life, it must be open to all Americans. There must be relatively easy access . . . for those who wish to promote their ideas, state their views, or sell their goods and services. . . . This unfettered flow of information is central to freedom of speech and freedom of the press which have been described correctly as the freedoms upon which all of our other rights depend." Cabinet Committee on Cable Communications, *supra,* at 19. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 756,

---

**10.** Still other types of medium "scarcity" are at least theoretically possible to justify content regulation. For example, a cable system guaranteed an exclusive franchise for a particular area by the appropriate governmental agency would establish what might be labeled "legal" scarcity. That is, other potential speakers, even those with sufficient funds to establish their own cable systems, would be shut out of the market, in this case by law.

96 S.Ct. 1817, 1822, 48 L.Ed.2d 346 (1976). *Cf. Home Box Office, supra,* 567 F.2d at 48. *See generally* T. Emerson, The Affirmative Side of the First Amendment, 15 Geo.L. Rev. 795, 805 (1981). Furthermore, enabling all segments of society to participate in cable television programming promotes the "First Amendment goal of producing an informed public capable of conducting its own affairs ...." *Red Lion,* 395 U.S. at 392, 89 S.Ct. at 1807.

The incidental restriction of mandatory access requirements on cable operators' First Amendment freedoms is no greater than is essential to the furtherance of these governmental objectives. Rhode Island requires cable operators only to set aside no more than seven of their 50 or more channels for public access. Cable operators retain complete editorial control over the remaining channels and can use any of these channels to express their own views. Mandatory access regulations thus result in only a minimal intrusion on cable operators' First Amendment activities.

Mandatory access requirements are even less intrusive on First Amendment freedoms than the fairness doctrine upheld by the Supreme Court in *Red Lion.* Because the fairness doctrine requires broadcasters to present both sides of every issue of public importance, broadcasters may choose to avoid coverage of controversial issues rather than be forced to devote considerable time to opposition spokesmen.[11] *See Red Lion,* 395 U.S. at 392–93, 89 S.Ct. at 1807– 08. *See also Tornillo,* 418 U.S. at 257, 94 S.Ct. at 2839 (newspaper right-to-reply stat-

ute "dampens the vigor and limits the variety of public debate"). Mandatory access requirements, by contrast, do not pose such a threat; they require only that all individuals be given an opportunity to air their views on a first-come, first-served basis. Access requirements, therefore, further, rather than inhibit, the presentation of important, controversial issues. *See Home Box Office,* 567 F.2d at 46 n. 82; Meyerson, *supra,* at 51.

In sum, the mandatory access requirements are a sensible accommodation of the rights of individuals to express themselves, the editorial freedom of cable television operators and the rights of viewers to receive information. The regulations recognize "the legitimate claims of those unable to gain access ... for expression of their views." *Red Lion Broadcasting Co. v. F.C.C., supra,* 395 U.S. at 400, 89 S.Ct. at 1812. Accordingly, the Court holds that Rhode Island's mandatory access regulations do not violate the First Amendment.

## II. TAKING OF PROPERTY

Berkshire contends that the DPUC's regulations deprive it of property without just compensation in violation of the Due Process Clause of the Fourteenth Amendment. The DPUC regulations require cable operators, at their own expense, to construct an institutional/industrial network capable of servicing all public institutions as well as to dedicate certain of the channels on their home subscriber network for public access purposes. In Berkshire's view, these requirements are an unconstitutional taking

---

**11.** The fairness doctrine has increasingly come under attack. Critics charge that the doctrine dampens public debate because broadcasters attempt to avoid airing controversial programs that may trigger the government enforced right-to-reply. *See, e.g.,* Goldberg, Cable Television, Government Regulation, and the First Amendment, 3 COMM/ENT L.J. 577, 587 (1981). Bazelon, F.C.C. Regulation of the Telecommunications Press, 1975 Duke L.J. 213, 215. Critics also contend that technological advances such as cable television, low-power television, and direct broadcast satellites have undermined the scarcity rationale on which the fairness doctrine is based. *See* Kaufman, Reassessing the Fairness Doctrine, New York

Times Magazine 16, 18–19 (June 19, 1983). Finally, critics maintain that the fairness doctrine unfairly imposes obligations on the broadcast media that could not constitutionally be imposed on print journalists. *Id.* at 17. As a result of these criticisms, the F.C.C. has proposed revocation of certain of its procedures governing access. *See* F.C.C.Rep. No. 5068 (Sept. 17, 1981). In addition the Chairman of the F.C.C. has called generally for "extend[ing] the full rights of the First Amendment to the electronic press." Fowler, Freedom of Electronic Speech, Washington Post Sept. 20, 1981, at C–7. *See generally* Fowler & Brenner, A Marketplace Approach to Broadcast Regulation, 60 Texas L.Rev. 207 (1982).

of property since the cable operator is neither paid directly by the state for the construction of these facilities, nor guaranteed a rate of return on its investment through the issuance of an exclusive franchise.

In *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court addressed the standards for determining what constitutes a "taking" of property. The Court held that a New York City landmark preservation ordinance did not result in an unconstitutional taking despite the fact that it limited the owner's ability to develop its property. *Id.* at 130, 98 S.Ct. at 2662. In making this determination, the Court relied primarily on three factors. First, the preservation law furthered the important governmental objective of preserving public areas with special historic, architectural or cultural significance. *Id.* at 129, 98 S.Ct. at 2661. Second, the preservation law did not preclude the property owner from using all of the airspace above its building. *Id.* at 136–37, 98 S.Ct. at 2665–66. Third, the law did not prevent the owner from making a profit or realizing a reasonable return on its investment. *Id.* at 136, 98 S.Ct. at 2665. Furthermore, last year in *Loretto v. Teleprompter Manhattan CATV Corp.,* —— U.S. ——, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), the Supreme Court reiterated the impact that a permanent, physical occupation of the property in question traditionally has upon "taking" analysis. *See id.* at 3172–76.

■ Applying these factors to the present case, the Court finds that the DPUC's regulations do not effect an unconstitutional taking of property. The regulations requiring cable operators to construct an institutional/industrial network and dedicate certain of their channels for public access were intended to promote the public good. These regulations further the First Amendment rights of service area residents by enabling them to use cable television more effectively. The regulations do not, moreover, deprive cable operators of all of the use of their property. They are permitted to charge a reasonable fee for the use of their facilities with certain limited exceptions. In addition, cable operators can utilize the institutional/industrial network as well as the remaining channels on the regular subscriber network for their own purposes. While the DPUC's regulations impose an economic burden on cable operators, there is simply no evidence that they prevent cable operators from making a profit or obtaining a reasonable return on their investment. Finally, the regulations do not result in any permanent, physical occupation of the plaintiff's property. Accordingly, the regulations are not an unconstitutional taking of property.

■ Even assuming that the DPUC regulations constitute a taking, the Court finds that cable operators have been given just compensation. Cable operators are given the right to use the streets and other public places to construct their cable distribution systems. *See* R.I.G.L. § 39–19–7 (1977 reenactment). *See also Loretto v. Teleprompter Manhattan CATV Corp., supra,* at 3172. Cable operators are also given a "natural monopoly" over cable television within their service areas. *See Omega Satellite Products v. City of Indianapolis, supra,* 694 F.2d at 127. The DPUC regulations are thus reasonable conditions on a government license rather than an uncompensated taking of property.

## III. ESTABLISHMENT CLAUSE

Berkshire's final challenge is to the DPUC rules requiring cable operators to construct an institutional/industrial cable network in addition to their regular subscriber network.

The relevant regulation states:

(b) Each institutional/industrial network shall be erected where necessary within the service area, and shall be so designed and constructed as to provide service to at least the following:

(1) The institutions, public buildings, and non-profit agency buildings in that service area specified for inclusion in the statewide interconnection network as designated by the Administrator in consulta-

tion with the Cable Television Advisory Council;

(2) all police and fire stations and municipal buildings, all public and private hospitals, all public libraries, all public, parochial and private schools, universities, and colleges, all religious institutions maintaining facilities within the service area, *and such other significant community institutions as the Administrator may designate in consultation with the Service Area Citizen's Advisory Committee for that service area.* (Any named institution in the above listing shall have the right to decline the offer of drops to either or both networks by so stating in writing to the Administrator and the committee for that service area.)

Rules Governing Community Antenna Television Systems § 7.3(b) (emphasis added).

Berkshire contends that requiring cable operators to provide service to all religious institutions and parochial schools is an establishment of religion in violation of the First and Fourteenth Amendments.[12]

■ The standards governing Establishment Clause challenges are well-established. To pass constitutional muster, the challenged governmental action must have a secular purpose, its principal or primary effect must neither advance nor inhibit religion, and it must not foster an excessive government entanglement with religion. *Mueller v. Allen,* —— U.S. ——, ——, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983); *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). While this standard is easily stated, it has proved difficult to apply. *Compare Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), *with Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and *Levitt v. Committee*

*for Public Education,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1972).

■ It cannot be doubted that requiring cable operators to provide service on their institutional networks to certain nonprofit institutions, including religious ones, serves a valid secular purpose. The DPUC regulations seek to enable the public to have broad access to the CATV network. The DPUC has sought to further this goal by requiring that the institutional/industrial network be constructed so that various nonprofit public institutions have the ability to tap into that system. Additionally, the institutional network has the potential to provide a number of services such as computer interconnect, teleconferences and closed circuit security surveillance. Rhode Island has a legitimate interest in ensuring that many institutions in Newport County, including religious institutions, have access to these services. *See Mueller v. Allen, supra,* —— U.S. at ——, 103 S.Ct. at 3066; *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976) (plurality opinion).

The Court finds, moreover, that the primary or principal effect of the DPUC regulations neither advances nor inhibits religion. In deciding which institutions should be provided with the ability to join this system, the DPUC was faced with a difficult task. Many nonprofit organizations may desire access to this network. It would be economically unfeasible to grid the entire area for the institutional network alongside the lines for the regular subscriber network. The DPUC chose to limit required access to the system to a group of easily identifiable public institutions which traditionally have close ties to many segments of the community and which can be presumed to exist in all communities in the state, and to such other similar institutions as the Administrator, in consultation with

12. In its complaint and pretrial memorandum, Berkshire claims that the DPUC regulations require cable operators to provide free service to religious institutions. This contention is incorrect. The regulations require only that cable operators design and construct an institutional/industrial network that is capable of serving all religious institutions; they do not preclude cable operators from charging reasonable fees for the use of their facilities. *See* Rules Governing Community Antenna Television Systems § 7.3(f).

the local Service Area Citizen's Advisory Committee (for the CATV system), may designate. Rules Governing Community Antenna Television Systems § 7.3(b). The requirement that service be made available to all religious institutions does not prevent cable operators from charging such institutions reasonable fees for the use of their facilities. Although assuring religious institutions access to the institutional network benefits these institutions, the Supreme Court has consistently rejected the proposition that " 'any program which in some manner aids an institution with a religious affiliation' violates the Establishment Clause." *Mueller v. Allen, supra,* —— U.S. at ——, 103 S.Ct. at 3064 (quoting *Hunt v. McNair,* 413 U.S. 734, 742, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973)).

The DPUC has not singled out religious institutions for preferential treatment. Rather, the DPUC regulations mandate that religious institutions be given the same opportunity to utilize the institutional network as are other nonprofit institutions, whether currently named in the regulation or later designated. The Supreme Court has made clear that the state does not violate the Establishment Clause where it neutrally provides assistance to a broad spectrum of similarly situated entities including religious institutions. *Mueller v. Allen, supra,* —— U.S. at ——, 103 S.Ct. at 3068 (Minnesota statute which gives *all* parents a deduction for tuition, textbooks and transportation costs for educating their children, even though most of these expenses would be for educating children in parochial schools, does not violate Establishment Clause); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 276–77, 70 L.Ed.2d 440 (1981) (state university which makes its facilities available for the use of registered student groups could not prohibit the use of these facilities for religious worship or instruction without violating the First Amendment; benefit to religion from inclusion in open forum is "incidental" and does not violate Establishment Clause); *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 672–73, 90 S.Ct. 1409, 1413–14, 25 L.Ed.2d 697 (1970) (New York statute

which grants property tax exemption to a range of nonprofit institutions, including religious ones, does not violate Establishment Clause). As the Supreme Court stated in *Widmar,* "[i]f the Establishment Clause barred the extension of general benefits to religious groups, 'a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair.' " 102 S.Ct. at 277 (quoting *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976) (plurality opinion)). Indeed, if some but not all religious institutions in Newport County, or none, were given access to the network, the regulation might well violate the First Amendment. *See Widmar,* 102 S.Ct. at 277–78.

The DPUC regulation stands on a different footing from the Massachusetts statute ruled unconstitutional by the First Circuit in *Grendel's Den, Inc. v. Goodwin,* 662 F.2d 102 (1st Cir.1981) (rehearing en banc), *aff'd sub nom. Larkin v. Grendel's Den, Inc.,* —— U.S. ——, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). In *Grendel's Den,* the statute gave churches and schools a veto power over new liquor licenses within 500 feet of their premises. 662 F.2d at 103. The court found that the law violated the Establishment Clause because it explicitly distinguished between religious and nonreligious groups in conferring its benefit. *Id.* at 105–06. It noted that although the law conferred its benefit on schools as well, "[t]his does not dilute its forbidden religious classification. The legislation defines in some detail the additional group to which it extends benefits—schools—and this definition cannot encompass all who are otherwise similarly situated to churches in all respects except dedication to 'divine worship'." *Id.* at 106–07 (quoting Mass.G.L. c. 138, § 15A) (footnote omitted). Additionally, the court distinguished *Walz, supra,* as not involving a statute "with facially religious classifications," even though the statute at issue specifically exempted property used for religious purposes, because "central to the [Supreme] [C]ourt's reasoning was the fact that New York 'has not sin-

gled out one particular church or religious group or even churches as such; rather it has granted exemption to all houses of worship within a broad class of property owned by nonprofit, quasi-public corporations.'" 662 F.2d at 105–06 n. 8 (quoting *Walz, supra,* at 673). Like the New York statute in *Walz,* the DPUC regulation simply puts religious institutions on an equal plane with other "nonprofit, quasi-public corporations" within a broad class of such groups. Therefore, the primary effect of requiring a cable operator to provide paid access to its institutional network to all religious institutions is to encourage broad public usage of that network rather than to advance religion.

The DPUC regulations also do not foster an excessive entanglement between the government and religious institutions. The regulations merely require that service on the institutional network be made available to religious institutions. Once the cable operator has designed and constructed its cable distribution system in such a manner as to satisfy this requirement, government involvement is at an end. In short, because the regulations do not contemplate a continuing relationship between the DPUC and the religious institutions of Newport County, there is no excessive entanglement between the government and religion. *See Mueller v. Allen, supra,* —— U.S. at ——, 103 S.Ct. at 3071; *Larkin v. Grendel's Den, Inc.,* 103 S.Ct. 505, 512 (1982); *Lemon v. Kurtzman, supra,* 403 U.S. at 619, 91 S.Ct.

at 2114. Accordingly, the regulations do not violate the Establishment Clause.[13]

The prevailing parties will prepare an order in keeping with this opinion.

---

13. Applicants for a CATV operating certificate must design their institutional/industrial network to provide service to "all religious institutions maintaining facilities within the service area." Rules Governing Community Antenna Television § 7.3(b)(2). Cable operators are thus required in the first instance to determine what constitutes a religious institution. This may prove "an impossible task in an age where many and various beliefs meet the constitutional definition of religion." *O'Hair v. Andrus,* 613 F.2d 931, 936 (D.C.Cir.1979). *See also* L. Tribe, American Constitutional Law §§ 14–16 (1978). As the Supreme Court noted in *Fowler v. State of Rhode Island,* 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953): "[I]t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment." *Id.* at 70, 73 S.Ct. at 527. Allowing a state licensed cable operator to determine which "religious

institutions" will be provided access to its cable system may well infringe an individual's free exercise rights. *See Widmar v. Vincent, supra,* 102 S.Ct. at 275 n. 11. The Court finds, however, that there is insufficient evidence in the record before it to establish this claim.

The question must be left for another day as it is not yet ripe for adjudication; the plaintiff in this case is not a religious institution that has been unconstitutionally denied access to the network. It thus lacks standing to raise the free exercise claim.

I must note that this is a troublesome point. In dialogue with the Court during the hearing it was stated that in Newport County alone there are 75 to 100 allegedly religious institutions, and it follows that if anyone is denied access to this medium, as not being a religious institution, the Court will then have to address the merits of this claim.