The Honorable Bobby Tullis State Representative Post Office Box 277 Mineral Springs, Arkansas 71851
Dear Representative Tullis:
This is in response to your request for an opinion regarding the franchising of cable television by the City of Lockesburg. You note that the City presently owns and operates a cable system which was built by the current applicant for a cable franchise. Your specific questions have been restated as follows:
(1) Does the City have to grant the franchise?
 (2) If not, what kind of chance would the City have in a First Amendment law suit by the applicant.
The answer to your first question appears to be no. The City of Lockesburg is not generally required or obligated to grant a franchise for cable service. 27 U.S.C.A. 521, et seq. (the Cable Communications Policy Act) represents a comprehensive regulatory scheme for cable television throughout the country. The federal legislation permits the states and/or local governments to regulate franchising of cable service within communities. One of the primary functions of the Cable Act is to make local franchising processes and procedures the primary means of cable television regulation. Rollins Cablevue Inc. v. Saienni Enterprises, 633 F. Supp. 1315, 1318 (D.Del. 1986); Housatonic Cable Vision v. Dept. of Public Utility, 622 F. Supp. 798, 811 (D.Conn. 1985).
47 U.S.C.A. 541 (a)(1) states: "A franchising authority may award, in accordance with the provisions of this subchapter 1 or more franchises within its jurisdiction." 522 defines "franchising authority" as "any governmental entity empowered by federal, state, or local law to grant a franchise,. . . ." It should also be noted that a franchise is a prerequisite to the operation of cable service under the Cable Act subject to one exception provided by statute. 541(b)(1) and (2) provides in pertinent part:
 (b)(1) Except to the extent provided in paragraph (2), a cable operator may not provide cable service without a franchise.
 (2) Paragraph (1) shall not require any person lawfully providing cable service without a franchise on July 1, 1984, to obtain a franchise unless the franchising authority so requires.
See also Opinion No. 87-354, a copy of which is attached hereto.
First Amendment attacks with regard to franchising of cable services typically arise in the context of an existing company having been awarded a franchise which is denied upon application for a renewal, and the franchise then being granted to a competing cable operator. While there appears to be no definitive answer to the question posed, several factors and tests which have been formulated in case law provide a basis for analysis of the issue.
It should be initially noted that the different media forms enjoy varying degrees of First Amendment protection. The law seeks to afford each form of media a degree of protection suited for it. Typically print media (i.e. newspapers) "enjoy (sic) broad protection from government interference." Group W. Cable v. City of Santa Cruz, supra, at 960. Unlike print media, broadcast media (i.e. radio and television) have been subject to more rigid governmental controls. The justification for intrusion in broadcast media is premised upon the rationale of "physical scarcity of the broadcast spectrum." Id. at 960. See, Nat'l Broadcasting Co. v. United States, 319 U.S. 190 (1943); Red Lion Broadcasting Co. v. United States,. 395 U.S. 367 (1969). While the United States Supreme Court has recognized that the operation of cable services implicates First Amendment rights, the Court has not delineated the exact nature and degree of the First Amendment rights to be afforded cable operators. Santa Cruz, supra; Los Angeles v. Preferred Communications, 476 U.S. 488 (1986). The analysis of the First Amendment interest of cable operators appears to fall under three theories: (1) natural monopoly, (2) scarcity rationale; and (3) substantial governmental interests.
The concept of "natural monopoly" has been relied upon as a means of justifying denial of access to the market by several competing cable operators. This theory is also used as a justification for governmental intrusion, See, e.g., Central Telecommunications, Inc. v. TCI Cablevision, 800 F.2d 711 (8th Cir, 1986), cert. denied, ___ U.S. ___, 107 S.Ct. 1358 (1987); Omega Satellite Products Co. v. City of Indianapolis, 694 F.2d 1370 (10th Cir. 1981); Berkshire Cablevision of Rhode Island, Inc. v. Burker,571 F. Supp. 976 (D.R.I. 1983). The courts have reasoned that cable systems function similar to public utilities and operate more efficiently when they serve the entire market. Government regulation of such natural monopolies maximizes economic efficiency and consumer welfare. The courts also state that the government's regulation of the physical aspects of cable necessitates regulation of the industry's economic functions as well.
The Eighth Circuit has adopted the justification favoring government intrusion under the natural monopoly rationale. Cable Telecommunications v. TCI Cablevision, 800 F.2d 711, 717 (8th Cir. 1986). The Eighth Circuit held in that case that the cable market in Jefferson City, Missouri could not sustain competition between two competing cable companies. The evidence before the court showed that "there was economic capacity for only one speaker." Id. at 717. The court held "that the city could properly offer a de facto exclusive franchise in order to create competition for its cable television market." Id. at 717. The term "competition" as used by the Eighth Circuit refers to competition generated by various operators in the bidding process, in so far as the variety of services generated (i.e. access to a greater number of channels), and is distinguished from competition generated as a result of a few or several competitors in the marketplace. In Central, Jefferson City was faced with the renewal of TCI's existing franchise or granting a franchise to Central. The city chose the latter to operate the city's single cable service because it proposed a state-of-the-art system which offered more channels and was more cost effective than that of TCI's antiquated system. The court recognized that each cable operator had a First Amendment interest as a cable operator and held that:
 (B)ecause the evidence shows that given the technology offered by the competing companies, there was economic capacity for only one speaker, it seems clear that Central's proposal went further in advancing the First Amendment interests of the viewing public in the greatest variety of programming obtainable.
Id. at 717.
While the Eighth Circuit's holding in Central can be relied upon as persuasive authority should the issue be raised in Arkansas, the Ninth Circuit's recent interpretation of the scarcity rationale in Preferred Communications Inc. v. Los Angeles,754 F.2d 1396 (9th Cir. 1985), (hereafter Preferred I) and the Supreme Court's affirmance in Preferred II should also be noted. The scarcity rationale, simply stated, is that government must act as a referee in the allocation of broadcast outlets because there are "more speakers (who) wish to broadcast than (can) physically be accommodated on the electromagnetic spectrum." Santa Cruz, supra, at 960. The scarcity rationale has typically been used in analyzing First amendment rights afforded wireless broadcasts. By analogy, the principle has been used in formulating First Amendment protections for cable television operators.
Given the broad range of broadcasting frequencies permitted by advanced technology, the scarcity rationale has come under attack. In Preferred I, the Ninth Circuit rejected the application of the physical scarcity rationale to cable television. Preferred I, at 1404. The court's reasoning was based upon the virtual inapplicability of the scarcity rationale due to the potential limitless access over a number of channels provided by cable. See also Omega Satellite Products Co. v. City Of Indianapolis, 694 F.2d 1370. The city sought to deny Preferred Communications access across existing utility poles and conduits on the basis of physical limitations. Because the city failed to substantiate the physical limitations across its existing conduits and infrastructures, the court refused to rely upon First Amendment tests applicable to broadcast media to permit the city to limit access to only one operator. The Court stated:
 We cannot accept the city's contention that, because the available space on such facilities is to an extent physically limited, the First Amendment standards applicable to the regulation of broadcasting permit it to restrict access and allow only a single cable provider to install and operate a cable television service.
Preferred I, at 1404. The court went on to find that the city failed to present evidence sufficient to support a finding that the city lacked the economic capacity to support only one cable franchise.
The Supreme Court in Preferred II affirmed the Ninth Circuit's reversal of the district court's dismissal of Preferred's First Amendment claim. The Court did not set forth the specific First Amendment interests of cable operators. However, its rationale suggests that limited physical capacity and limited economic demand remain as factors to be considered, although the city in that case failed to present facts sufficient to support regulation on these bases.
In United States v. O'Brien, 391 U.S. 367 (1968), the Supreme Court articulated four tests for balancing the constitutionality of regulation of non-speech elements of First Amendment conduit. The process of selecting and granting franchises for cable has been characterized as regulation of non-speech aspects of cable operations. In balancing non-communicative aspects, competing societal interests must be weighed against First Amendment values. The O'Brien test provides that"
A government regulation is sufficiently justified (1) if it is within the constitutional power of the government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
Santa Cruz, supra, at 961; Preferred I, at 1405-06.
Under the O'Brien test, the government must prove that it has substantial and/or important governmental interests in permitting the operation of cable service by a single cable operator. The regulation must be content-neutral, to the extent that the regulation is not directed at the suppression of speech, and the restriction on speech must be incidental but no greater than necessary to further the government's goals.
In both Santa Cruz and Preferred I, the cities argued that they had sufficient interests in regulating physical and aesthetic disruption which could result from the operation of more than one cable service. The courts recognized that the cities have a legitimate interest in regulating uses and inconveniences in the public domain. However, they concluded that restricting access of cable operators could not be used to achieve this goal where to do so jeopardizes First Amendment rights. O'Brien requires that the means chosen by the government be narrowly tailored to achieve its goals. The Ninth Circuit found that the means chosen by the cities of Los Angeles and Santa Cruz were not narrowly tailored. The court intimates that means less restrictive than a complete denial of access by potential operators could be fashioned to achieve the cities' goal of preserving and protecting uses in the public domain. Preferred I at 1406; Santa Cruz at 966-67.
The natural monopoly approach may be relied upon if the facts indicate that the city could economically support only one cable franchise. The city would have to offer sufficient evidence of a limited demand for cable service in its community, as was the case in Jefferson City in Central Telecommunications. The city could also assert physical scarcity; however, such an argument may be more difficult to prove given the arguable limitless access available from cable operations, as well as the advanced technology which permits greater access across existing infrastructures. The city's successful response to a First Amendment claim may necessitate a finding that the city has a substantial interest in granting only a single franchise. In the absence of physical and economic limits, the city would have to prove sufficient governmental interest to justify the operation of a single cable franchise, and that the grant of a single franchise furthers its interests.
It becomes apparent that a conclusive answer to your second question will depend upon all of the particular facts involved. However, we hope that the foregoing offers some general guidance in assessing potential First Amendment claims.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elisabeth A. Walker.