**PREFERRED COMMUNICATIONS, INC., a California corporation, Plaintiff-Appellant,**

v.

**CITY OF LOS ANGELES, CALIFORNIA, a municipal corporation; and Department of Water and Power, a municipal utility, Defendants-Appellees.**

No. 84–5541.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1984.

Decided March 1, 1985.

As Corrected May 20, 1985.

Harold R. Farrow, Farrow, Schildhause, Wilson & Rains, Sacramento, Cal., John A. Wellcome, Mark Leach, Pachter, Gold & Schaffer, Los Angeles, Cal., for plaintiff-appellant.

George H. Shapiro, James P. Mercurio, Gerald E. Oberst, Jr., Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., amicus curiae.

Edward C. Farrell, Ira Reiner, City Atty., Edward Perez, Deputy City Atty., Los Angeles, Cal., for defendants-appellees.

Jerome B. Falk, Jr., Dirk M. Schenkkan, Therese M. Stewart, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., amicus curiae.

Before SNEED, ANDERSON, and FERGUSON, Circuit Judges.

SNEED, Circuit Judge:

Preferred Communications, Inc. (PCI) brought an action arising under 42 U.S.C. § 1983 (1982) against the City of Los Angeles (the City) and the Los Angeles Department of Water and Power claiming a deprivation of rights protected under the First and Fourteenth Amendments, as well as violations of the federal antitrust laws, and various state law violations. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337, 1343, 2201, 2202 (1982), and under its pendent jurisdiction. It found as a matter of law that the City's regulatory scheme did not violate the First Amendment rights of a prospective cable television operator and that the City was immune from antitrust liability under the state action exemption established in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Accordingly, the court dismissed PCI's complaint without leave to amend, pursuant to Fed.R.Civ.P. 12(b)(6).[1]

PCI appeals from this dismissal. As the district court dismissed PCI's federal claims without leave to amend, its decision is final and appealable. *See Whittington v. Whittington*, 733 F.2d 620, 621 (9th Cir.1984); *Conerly v. Westinghouse Electric Corp.*, 623 F.2d 117, 119 (9th Cir.1980). This court therefore has jurisdiction over PCI's timely appeal under 28 U.S.C. § 1291 (1982). We affirm the district court's decision insofar as it pertains to the plaintiff's antitrust claims and reverse its dismissal of the First Amendment claim.[2]

## I.

### STANDARD OF REVIEW

A decision to dismiss a complaint for failure to state a claim upon which relief can be granted is reviewable de novo. *Guillory v. County of Orange*, 731 F.2d 1379, 1381 (9th Cir.1984). In conducting this review, we must accept all material allegations in the complaint as true. *Berner v. Lazzaro*, 730 F.2d 1319, 1320 (9th Cir.1984). All doubts are resolved in favor of the plaintiff. *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 834–35 (9th Cir. 1980). A dismissal cannot be upheld " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* at 834 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)); *accord Halet v. Wend Investment Co.*, 672 F.2d 1305, 1309 (9th Cir.1982). With these principles in mind, we turn to PCI's complaint.

## II.

### THE COMPLAINT

As alleged in PCI's complaint, the pertinent facts appear as follows. PCI is a corporation which was organized for the

---

1. PCI also claimed two state law violations. These were dismissed without prejudice for refiling in state court.

2. Briefs Amici Curiae on the First Amendment issue were filed by American Television & Communications Corp. and Home Box Office, Inc., jointly, on behalf of PCI and by the cities of Palo Alto and Menlo Park and the Town of Atherton, jointly, on behalf of the City.

purpose of operating a cable television system in an area of Los Angeles designated by the City as the South Central District. PCI's intended operation entailed the installation of a network of distribution cables in the region PCI wished to serve. PCI proposed to attach its cable to existing public utility facilities—poles and conduits located on property owned in fee by the utility and on or under easements owned by the utility running over both public and private rights of way.

For a number of years, utilities throughout the State of California have dedicated surplus space on their facilities for similar uses. The California legislature recognized this dedication, at least with regard to non-municipal utilities, when it enacted Cal.Pub. Util.Code § 767.5(b) (West Supp.1984) (dedicating surplus space and excess capacity on public utility support structures for use by cable television companies). Accordingly, PCI approached two utilities in the Los Angeles area—the Pacific Telephone and Telegraph Company and the Los Angeles Department of Water and Power—to negotiate a lease of space on those companies' poles and conduits. Both utilities informed PCI that such an agreement would not be possible until PCI obtained a cable television franchise from the City. PCI then petitioned the City in an attempt to obtain such a franchise.

The City allocates franchises through an auction process. Franchising or licensing the construction of a cable television system is authorized by Cal.Gov't Code § 53066 (West Supp.1984).[3] The City requires companies wishing to participate in the process to submit to a variety of conditions. A potential bidder must pay a $10,-000 filing fee and a $500 good faith deposit and must agree to pay up to an additional $60,000 to reimburse the City for expenses incurred in holding the auction. It must provide the City with a detailed proposal outlining its intended operations over the succeeding nine years and must demonstrate to the satisfaction of the City that it has a "sound financial base," that its proposed operations constitute "sound business plans," and that it has the proper "character qualifications" and "demonstrated business experience." The City also requires hopeful bidders to agree to pay the City a percentage of future annual gross revenues and to provide a variety of customer services, including at least 52 channels of video service and interactive (two way) service.

More significantly, the City exacts a commitment to provide various mandatory access and leased access channels. Bidders must agree to provide, without compensation, two channels for use by the City and by other government entities, two channels for use by educational institutions, and two channels for use by the general public, along with staff and facilities to aid in programming. Bidders must further agree to provide two leased access channels as

---

**3.** On October 11, 1984, Congress enacted the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779. The Cable Policy Act amends the Communications Act of 1934 to establish a comprehensive national cable television policy.

The Act envisions a franchising model similar to the City's procedure. It prohibits cable operators from providing cable service without a franchise. *Id.* § 621(b)(1). Section 621(a)(1) of the Act empowers a franchising authority "to award 1 or more franchises within its jurisdiction." The term "franchising authority" is defined broadly to include "any governmental entity empowered by Federal, State or local law to grant a franchise." *Id.* § 602(9). A franchise authorizes the construction of a cable system over public rights of way and over easements dedicated for compatible uses; the cable operator is responsible for paying the cost of installation and operation, ensuring the continued safety, functioning, and appearance of the property affected, and providing just compensation to the owners of property damaged in the course of installation and operation. *Id.* § 621(a)(2).

The Cable Policy Act also provides for mandatory access and leased access channels. Section 611 authorizes the franchising authority to require as a condition of the franchise the dedication of channel capacity for public, educational, or government use. Similarly, § 612 requires the operator to designate a percentage of its channel capacity for commercial use by persons unaffiliated with the operator. The Act prohibits the operator from exercising any editorial control over programming by public, educational, government, or unaffiliated commercial users. *See id.* §§ 611(e), 612(c)(2).

well. An undertaking to provide portable production facilities and to permit free use by the City of all poles, towers, ducts, and antennas is also required.

Finally, potential cable operators must agree to leave a variety of business decisions to the discretion of the City. Pricing and customer relations are left to the City's control. The operator must form a "cable franchise advisory board," subject to City approval. Lastly, the City reserves the right to inspect the cable operation upon demand and requires a waiver of any right to recover for damages or other injury arising from the cable franchise or its enforcement.

After the submission of bids from companies willing to submit to the foregoing conditions, the City chooses the operator it deems to be "best" for each area. It awards just one franchise in each region. The City refused PCI's request for a franchise because PCI had failed to participate in the auction process. The City will not permit PCI to operate a cable television system in the South Central District under any circumstances.

### III.

### ISSUES ON APPEAL

PCI's appeal raises two issues—one constitutional and one statutory. The constitutional one is whether the City's cable franchise procedure in any respect violates the First Amendment. The statutory one is whether the City is immune from antitrust liability under the doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

### IV.

### THE FIRST AMENDMENT

PCI's arguments amount to a sweeping attack against the City's cable television franchising process. PCI contends, inter alia, that its right to construct a cable

television system and disseminate programming via the cable medium should not be conditioned upon having to participate in an auction procedure or be otherwise subject to the City's discretion. It maintains that the City cannot choose which cable providers may use the City's facilities to install and operate cable systems and cannot condition that use on such requirements as the City has imposed in this case.

These contentions are wide-ranging. Were we to attempt to respond in like measure, we would not escape the charge of rendering advisory opinions poorly disguised as sweeping dicta. On the other hand, we cannot regard this case as one which is either unripe for decision or moot. PCI has sought a franchise from the City which the City to date has refused to grant.

An escape from our dilemma would be to identify a fundamental issue which, if decided in favor of the City, would require affirming the judgment of the district court and which, if decided adversely to the City, would require reversal and a redesign by the City of its procedures relating to cable television. We believe such an issue is as follows:

Can the City, consistent with the First Amendment, limit access by means of an auction process to a given region of the City to a single cable television company, when the public utility facilities and other public property in that region necessary to the installation and operation of a cable television system are physically capable of accommodating more than one system?

We do not decide the validity of any of the specific requirements called for by the City's franchising process. In particular, we do not decide whether the City may validly require cable operators to turn over channels for use by the government, by educational institutions, and by the public and for leased use by others.[4]

The City denies that even this issue need be confronted. It asserts that PCI lacks

---

**4.** We note, however, that the mandatory access and leased access requirements contained in the City's franchising scheme and called for by §§ 611–612 of the Cable Communications Policy

Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779, 2782–85, pose particularly troubling constitutional questions. Imposing access requirements on the press would no doubt be invalid.

standing to challenge its franchising process. Although not denying the presence of a physical capacity to accommodate more than one cable television system, the City maintains that the physical scarcity of available space on public utility structures, the economic scarcity of the cable medium, and the disruptive effect that installing and maintaining a cable system has on the public domain each justify its effort to restrict access to its facilities to a single cable television company. Finally, the Cities of Palo Alto and Menlo Park and the Town of Atherton, as amici curiae, assert that the City's franchising scheme presents no impediment to PCI's ability to originate programing and thus does not contravene the First Amendment. Each of these arguments will be considered in turn.

We conclude that the question we consider raised by this appeal should be answered negatively. For that reason we reverse the district court's dismissal of PCI's First Amendment claim.

### A. *Standing*

■ The City contends that, because it did not participate in the auction process,

PCI lacks Article III standing to challenge the City's regulations. The Supreme Court set out the minimum requirements for standing in *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). To invoke a court's authority, a party must:

> "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

*Id.* at 472, 102 S.Ct. at 758 (footnote omitted).[5]

PCI suffered no actual or threatened injury, the City maintains. Any injury is said to be purely speculative. We disagree. PCI's action challenges the auction process itself. It has been barred from access because of its refusal to enter the bidding

See *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Courts have divided as to the effect of the *Tornillo* holding on the validity of access requirements imposed on cable television operators. Compare *Midwest Video Corp. v. FCC*, 571 F.2d 1025, 1055–56 (8th Cir.1978) (suggesting that to the extent the government's interest in imposing such requirements stems from the economic scarcity of the cable medium, the Supreme Court's decision in *Tornillo* casts considerable doubt on the government's ability to do so), *aff'd on other grounds*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) *with Home Box Office, Inc. v. FCC*, 567 F.2d 9, 46 n. 82 (D.C.Cir.) (suggesting that, unlike the right of reply statute involved in *Tornillo*, which was triggered by the publication of certain items, rules requiring cable operators to dedicate channels to common carrier use would not diminish the overall diversity of cable programming or deter the presentation of controversial material regarding public figures), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977) *and Berkshire Cablevision of Rhode Island v. Burke*, 571 F.Supp. 976, 983–88 (D.R.I.1983) (upholding franchising procedure that required applicants to provide access channels for governmental,

educational, and public use). We decline to reach this question.

5. In *Valley Forge*, the Supreme Court also articulated a set of prudential limitations on standing. See also *McMichael v. County of Napa*, 709 F.2d 1268, 1270 (9th Cir.1983). Thus, the plaintiff must assert his own legal rights and interests; his claim cannot rest on the rights or interests of a third party. 454 U.S. at 474, 102 S.Ct. at 759. Further, courts should refrain from adjudicating "abstract questions of wide public significance" amounting to " 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Id.* at 475, 102 S.Ct. at 760 (quoting *Warth v. Seldin*, 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–2206, 45 L.Ed.2d 343 (1975)). Finally, the plaintiff's interest must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* (quoting *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)). None of these principles operate to deny standing to PCI. See *Century Federal, Inc. v. City of Palo Alto*, 579 F.Supp. 1553, 1562 (N.D.Cal.1984).

process and abide by the City's numerous conditions. It follows that PCI clearly alleges a real injury, fairly traceable to the challenged action of the City. If PCI is right on its First Amendment claim as we have framed it, the City has wrongfully subjected PCI to a process that fails to conform to the requirements of the First Amendment. This affords PCI standing.

## B. *The Cable Television Medium and the First Amendment*

█ Turning to the issue of the First Amendment protection enjoyed by cable television, it is clear that some such protection exists.[6] *See Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 127–29 (7th Cir.1982); *Community Communications Co. v. City of Boulder*, 660 F.2d 1370, 1376 (10th Cir.1981), *cert. dismissed*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982); *Midwest Video Corp. v. FCC*, 571 F.2d 1025, 1052–57 (8th Cir. 1978), *aff'd on other grounds*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 43–51 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). The problem before us is whether this protection permits an affirmative answer to the issue this appeal raises or requires a negative answer.

### 1. *Cable Television and Broadcasting Distinguished*

█ Initially, the City argues that the standards applicable to government regulation of broadcasting also govern the regulation of cable. We disagree. We recognize that the First Amendment allows the government greater latitude in regulating the broadcast medium than it enjoys in regulating other, more traditional media. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997,

87 L.Ed. 1344 (1943). And several courts, to a varying extent, have applied the broadcasting standards to the government's efforts to regulate cable. *See, e.g., Community Communications Co.*, 660 F.2d at 1375–80; *Black Hills Video Corp. v. FCC*, 399 F.2d 65, 69 (8th Cir.1968); *Berkshire Cablevision of Rhode Island v. Burke*, 571 F.Supp. 976, 983–88 (D.R.I.1983). We decline to do so. "Each medium of expression ... must be assessed for First Amendment purposes by standards suited to it...." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975). "[D]ifferences in the characteristics of new media justify differences in the First Amendment standards applied to them." *Red Lion Broadcasting Co.*, 395 U.S. at 386, 89 S.Ct. at 1804. Despite the superficial similarity between broadcasting and cable television, there are significant differences between the two media that have First Amendment consequences.

The Supreme Court's determination to allow greater government intrusion into the affairs of broadcasters rests on the physical scarcity of radiowaves; the electromagnetic spectrum simply is physically incapable of carrying the messages of all who wish to use the medium. *Century Federal, Inc. v. City of Palo Alto*, 579 F.Supp. 1553, 1563 (N.D.Cal.1984). As Justice Frankfurter observed in *National Broadcasting Co. v. United States*,

> Unlike other modes of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation.... The right of free speech does not include, however, the right to use the facilities of radio without a license.

319, U.S. 190, 226–27, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943); *accord Loveday v. FCC*, 707 F.2d 1443, 1458 (D.C.Cir.), *cert. denied*,

---

**6.** For example, direct restrictions on the content of cable broadcasts would generally be invalid. *See, e.g., Cruz v. Ferre*, 571 F.Supp. 125 (S.D.Fla. 1983) (invalidates ordinance imposing sanctions on cable licensee's transmission of "indecent" programs); *Community Television of Utah, Inc. v. Roy City*, 555 F.Supp. 1164 (D.Utah 1982) (same); *Home Box Office, Inc. v. Wilkinson*, 531 F.Supp. 987 (D.Utah 1982) (same).

— U.S. ——, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983); *Scott v. Rosenberg,* 702 F.2d 1263, 1272 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984). Without licensing, the broadcast spectrum would be rendered virtually useless to all.

 That is not the case under the alleged facts before us. PCI wishes to obtain permission to string its cable from utility poles and through utility conduits. Because of PCI's refusal to comply with the City's auction process, the City has withheld that permission. We cannot accept the City's contention that, because the available space on such facilities is to an undetermined extent physically limited, the First Amendment standards applicable to the regulation of broadcasting permit it to restrict access and allow only a single cable provider to install and operate a cable television system.

Apparently the only case to apply the physical scarcity rationale to cable television in such a direct fashion is *Black Hills Video Corp. v. FCC,* 399 F.2d 65, 69 (8th Cir.1968). That case involved the FCC's efforts to regulate an early community antenna system that merely retransmitted signals received from broadcasting stations; cable technology, however, has evolved significantly since the time of *Black Hills Video. See Midwest Video Corp.,* 571 F.2d at 1054; *Century Federal, Inc.,* 579 F.Supp. at 1563 n. 19. More recent cases have expressly concluded that the physical scarcity rationale does not apply to cable. *See, e.g., Omega Satellite Products Co.,* 694 F.2d at 127 ("[F]requency interference [is] a problem that does not arise with cable television."); *Home Box Office, Inc.,* 567 F.2d at 44–45 ("[A]n essential precondition of [broadcast] theory— physical interference and scarcity requiring an umpiring role for government—is absent."). *Black Hills Video,* therefore, is a doubtful precedent today.[7]

Moreover, PCI has alleged in its complaint that there *is* space available on the City's poles and in its conduits. PCI has alleged that the City has held itself out as a provider of space on its utility poles to cable television companies and that state law requires private utilities to make space available for the attachment of television cable. *See* Cal.Pub.Util.Code § 767.5(b) (West Supp.1984). Because we must accept these allegations as true, we must find that the physical scarcity that could justify increased regulation of cable operations does not exist in this case. We express no opinion on the issue of the manner in which the City should allocate access to poles and conduits to competing cable systems when these structures are incapable of accommodating all those seeking access.

### 2. *Natural Monopoly as a Justification of Government Regulation*

The City asserts next that, because cable television is a natural monopoly, economic scarcity justifies government regulation. We need not decide this issue at this time. PCI's complaint alleges that competition for cable services is economically feasible in the Los Angeles area. As we must accept this allegation as true, we assume that no natural monopoly exists.

In passing, we note that the Supreme Court rejected an argument that rested a particular government regulation of the press on economic scarcity. In *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Court invalidated a state statute granting political candidates a right to equal space to reply to criticism in newspapers. The Court refused to accept the plaintiff's argument that because economic conditions made entry into newspaper markets difficult, the government could impose a limited right of access to the press. Although the Court acknowledged that most newspapers enjoy a monopoly in their areas of distribution, it did not conclude that this circum-

---

**7.** In *Midwest Video Corp. v. FCC,* the Eighth Circuit limited *Black Hills Video* to its facts, further undercutting its precedential value. *See* 571 F.2d at 1054 n. 71 (reading *Black Hills Video* as upholding FCC efforts to regulate cable operators' use of microwaves); *see also Century Federal, Inc.,* 579 F.Supp. at 1563 n. 19 (doubting continuing vitality of *Black Hills Video* ).

stance gave rise to a duty to provide public access to the press. *See id.* at 249–58, 94 S.Ct. at 2835–39; *see also Midwest Video Corp.*, 571 F.2d at 1056; *Home Box Office, Inc.*, 567 F.2d at 46.

Several cases, however, have concluded that cable's alleged natural monopoly characteristics do provide a basis for some degree of government regulation. *See, e.g., Community Communications Co.*, 660 F.2d at 1379; *Berkshire Cablevision of Rhode Island*, 571 F.Supp. at 985–86; *see also Omega Satellite Products Co.*, 694 F.2d at 127–28; *Hopkinsville Cable TV, Inc. v. Pennyroyal Cablevision, Inc.*, 562 F.Supp. 543, 547 (W.D.Ky.1982). In *Community Communications Co.*, the Tenth Circuit distinguished *Tornillo* by tying the natural monopoly characteristics of cable to the fact that installing and operating a cable system burdens public utility facilities and streets. The court asserted that the economic scarcity present in *Tornillo* "was unrelated to a disruptive use of the public domain requiring a government license." 660 F.2d at 1379. A cable company, by contrast, "must significantly impact the public domain in order to operate; without a license, it cannot engage in cable broadcasting to disseminate information." *Id.*

This statement is much too broad. It suggests that simply because cable's disruption of the public domain gives rise to a need for licensing, it would also justify the monopoly the City seeks to create by its auction process. We find it necessary, however, to undertake a more detailed inquiry into whether the City's auction process is a permissible governmental re-

sponse to the burden imposed by cable on public resources.[8] We now turn to that question.

### 3. *Disruption of Public Resources as a Justification of Government Regulation*

■ Concluding that cable is not characterized by physical scarcity analogous to that of the broadcast medium or by economic scarcity does not mean that *all* regulation of cable operations is invalid. *See Home Box Office, Inc. v. FCC*, 567 F.2d 9, 46 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). The First Amendment does not preclude government regulation of noncommunicative aspects of speech. *Id.* at 47; *see Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 502, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981) (Opinion of White, J.) ("[T]he government has legitimate interests in controlling the noncommunicative aspects of the medium, ... but the First and Fourteenth Amendments foreclose a similar interest in controlling the communicative aspects.") (citation omitted).

■ The Supreme Court articulated a test for assessing the reasonableness of such regulations in *United States v. O'Brien:*

> [A] government regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment free-

---

**8.** The Tenth Circuit also suggested that newspapers had enjoyed a long tradition of freedom from government interference, while cable television had not. *Community Communications Co.*, 660 F.2d at 1379; *accord Berkshire Cablevision of Rhode Island*, 571 F.Supp. at 985. This distinction merely begs the question.

The district court in *Berkshire Cablevision* offered a more helpful distinction. It asserted that, while a newspaper's natural monopoly did not preclude the public's use of the print medium, cable's natural monopoly did prevent public use of the television medium. *See* 571

F.Supp. at 986. As a factual matter, however, it is not clear that this is true. *Cf. Loveday v. FCC*, 707 F.2d 1443, 1459 (D.C.Cir.) (noting the proliferation of broadcast stations since the *National Broadcasting* case and the fact that now there are many more stations than newspapers, and concluding that "it seems unlikely that the First Amendment protections of broadcast political speech will contract further, and they may well expand."), *cert. denied*, —— U.S. ——, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983). And in reviewing a dismissal, we must resolve all doubts in favor of the plaintiff.

doms is no greater than is essential to the furtherance of that interest.

391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); *see Playtime Theaters, Inc. v. City of Renton,* 748 F.2d 527, 534–35 (9th Cir.1984). PCI concedes that the City has an interest in minimizing the disruption of the public domain and that this interest is "unrelated to the suppression of free expression." [9] But the means chosen by the City to serve its interests—allowing only the single company selected through the franchise auction process to erect and operate a cable system in each region—creates a serious risk that city officials will discriminate among cable providers on the basis of the content of, or the views expressed in, their proposed programs. This risk can be reduced, if not eliminated, by means less destructive of First Amendment rights.

Cable television, to repeat, requires the use of public facilities, and this provides a justification for some government regulation. The City has legitimate interests in public safety and in maintaining public thoroughfares. In *Community Communications Co.,* 660 F.2d at 1377, the court recognized that cable entails use of the public domain and that this use constitutes a basis for governmental regulation that is not present in case of newspapers:

> A city needs control over the number of times its citizens must bear the inconvenience of having its streets dug up and the

best times for it to occur. Thus, government and cable operators are tied in a way that government and newspapers are not.

*Id.* at 1378; *accord Omega Satellite Products Co.,* 694 F.2d at 127–28; *Berkshire Cablevision of Rhode Island,* 571 F.Supp. at 984.

Regulating such use and inconvenience, however, is quite different from restricting access, as the City attempts to do here. It has not been alleged that public utility facilities owned or controlled by the City can only support the use of a single or a few cables. Indeed, PCI has alleged precisely the contrary. A different and more sharply focused response by the City could protect the legitimate interests of the City and its citizens.

 Certainly, the mere fact that the burden on public resources creates a need for government regulation does not lead to the conclusion that the First Amendment allows as much government intrusion in the cable area as it does with regard to broadcasting. *See* Comment, *Access to Cable Television: A Critique of the Affirmative Duty Theory of the First Amendment,* 70 Calif.L.Rev. 1393, 1405–08 (1982). Nor do we believe that the City's interest in protecting the public domain justifies its effort to auction off the right to operate a cable television system. The City's interest is not enough to counterbalance the risk that diversity in editorial judgments will be limited by the City's determination to

---

**9.** In their amicus brief, the Cities of Palo Alto, Menlo Park, and Atherton suggest several other government "interests" served by a restrictive franchising regime. Amici assert that the City has interests in preventing "cream skimming"—wiring only affluent, and therefore more profitable, portions of the franchise area; ensuring the provision of community access and leased access to cable facilities, and encouraging the development of state-of-the-art cable systems. Amici contend that these interests serve to justify the City's approach to cable franchising.

On the present state of the record, we cannot agree. Here, the City bears the burden of proving that the elements of the *O'Brien* test are satisfied. *Playtime Theaters, Inc. v. City of Renton,* 748 F.2d 527, 535 (9th Cir.1984); *see First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978); *Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976) (Opinion of Bren-

nan, J.). Nothing in the record suggests that the City has a substantial interest in any of the concerns raised by amici. As we indicated in *Playtime Theaters,* the City must justify its regulations in terms of its own problems. It may not rely on the problems faced by other communities or on justifications that are merely conclusory and speculative. *See* 748 F.2d at 536–37. Furthermore, there must be a showing that these interests are "unrelated to the suppression of free expression." *See O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. There is nothing in the record on this issue. We are not convinced that restricting the number of cable operators in the manner set forth in PCI's complaint furthers these interests in a manner consistent with the First Amendment. As we noted earlier, we express no opinion as to whether the City may impose its access and coverage requirements by other means. Those issues are not before us.

choose the cable providers that it will permit to use the medium. *Cf. Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how government regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.")

### 4. *The Public Forum Doctrine as a Check on Government Regulation*

Our conclusion that the question before us should be answered, "No," is aided by Supreme Court cases shaping the public forum doctrine. What PCI wants, in essence, is a right of access to utility poles and conduits that are either owned or controlled by the City, subject, of course, to reasonable terms designed to compensate the City for the use of those facilities. PCI wishes to disseminate its message to the public. Of course, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Association*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). Rather, the nature and character of the property at issue fix the conditions under which we must evaluate both PCI's claimed right of access and the limitations imposed by the City on that right. *See Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); *see United States v. Albertini*, 710 F.2d 1410, 1414 (9th Cir. 1983) ("Merely permitting public access to

property other than streets or parks ... does not open the facility for use as a public forum.... The place or its intended use must somehow render the facility appropriate for expression.") (citation omitted).

The Supreme Court has identified three categories of public property. At one extreme are "places which by long tradition or by government fiat have been devoted to assembly and debate...." *Perry Education Association*, 460 U.S. at 45, 103 S.Ct. at 954. This category includes "streets and parks ... [that] have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (Opinion of Roberts, J.). In such places, the First Amendment sharply curtails the government's ability to limit expressive activity. *Perry Education Association*, 460 U.S. at 45, 103 S.Ct. at 954. While the government may not ban communication entirely, it may enforce content-neutral regulations of the time, place, and manner of expression that "are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.; see Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). To pass constitutional scrutiny, a content-based exclusion of expression must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Perry Education Association*, 460 U.S. at 45, 103 S.Ct. at 955; *Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980).

A second category comprises public property that the government has opened for use by the public for expressive activity. *Perry Education Association*, 460 U.S. at 45, 103 S.Ct. at 954; *see, e.g., Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university meeting facilities opened for use by student

groups). Although the state is not required to retain the open character of its facilities indefinitely, while it does so, the standards applicable to the traditional public forum govern the state's regulatory efforts. *Perry Education Association,* 460 U.S. at 46, 103 S.Ct. at 955. Again, the government is empowered to enforce reasonable time, place, and manner regulations. *Id.*

■ The third and final category is property "which is not by tradition or designation a forum for public communication...." *Id.; United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981). There, "[i]n addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Association,* 460 U.S. at 46, 103 S.Ct. at 955.

### a. *Utility Poles and Conduits are not Traditional Public Forums*

■ We reject the contention that merely because utility poles and conduits are located on or under public streets and rights-of-way, they constitute traditional public forums. *See generally* G. Shapiro, P. Kurland, & J. Mercurio, *'Cablespeech' The Case for First Amendment Protection* 175–84 (1983). The Supreme Court's recent decision in *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* —— U.S. ——, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), precludes such a conclusion. There, the Court upheld a municipal ordinance prohibiting the posting of signs on public property—including public utility poles. Citing *O'Brien,* the Court concluded that the government had a valid interest in advancing aesthetic values and that the ordinance was no broader than necessary to protect that interest. *See* 104 S.Ct. at 2129–32.

The Supreme Court also rejected the plaintiff's contention that the public property covered by the ordinance constituted a public forum or should have been treated as a public forum because of its location on streets and thoroughfares which traditionally were so viewed. *See id.* at 2133–34. The plaintiff had not demonstrated "the existence of a traditional right of access respecting such items as utility poles for purposes of their communication comparable to that recognized for streets and parks...." *Id.* at 2134.

### b. *Vincent Distinguished*

We do not believe, however, that *Vincent* governs the issue before us. First, PCI's envisioned use of the City's facilities—stringing or laying cable—is basically compatible with the normal use of those facilities—carrying phone and electricity lines. This was not true in *Vincent,* where the plaintiffs sought to post signs on lampposts and utility poles. It is possible, therefore, that although the public utility poles and conduits are not public forums by tradition or designation, each may nevertheless serve as a forum for expression via the cable medium. *See Gannett Satellite Information Network v. Metropolitan Transportation Authority,* 745 F.2d 767, 773 (2d Cir.1984) ("Public property, ... which is neither a traditional nor a designated public forum, can still serve as a forum for First Amendment expression if the expression is appropriate for the property ... and is not 'incompatible with the normal activity of a particular place at a particular time.'") (citation omitted) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972)). Thus, while a flat ban on sign posting may constitute a narrowly tailored measure to promote the City's interest in eliminating visual clutter, *see Taxpayers for Vincent,* 104 S.Ct. at 2130–32, banning the installation of cable is not necessarily an appropriate way to further the City's interest in minimizing disruption of the public domain, *see Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) ("The nature of

a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' ") (quoting Wright, *The Constitution on the Campus,* 22 Vand.L.Rev. 1027, 1042 (1969)).

Second, PCI's complaint sufficiently alleges that the utility facilities at issue *do* constitute a kind of public forum, either by tradition or by designation. The State of California has dedicated "surplus space" on public utility structures for use by cable television companies. *See* Cal.Pub.Util. Code § 767.5(b) (West Supp.1984). And as to City-owned structures, PCI alleges that the Los Angeles Department of Water and Power has held itself out to cable companies as a provider of pole-attachment services. Moreover, the franchising process itself constitutes the City's effort to grant at least some access to its facilities.

Treating the utility structures as a type of public forum places limits on the City's ability to exercise its licensing power. While the City may promulgate reasonable time, place, and manner regulations, it may not limit access under the circumstances set forth in the issue before us. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969) ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional."); *accord NAACP, Western Region v. City of Richmond,* 743 F.2d 1346, 1357 (9th Cir.1984) ("Unfettered discretion to license speech cannot be left to administrative bodies."). The City may not solicit "bids" from prospective speakers and deny access to its facilities to all save the highest "bidder" in each region.

Moreover, even if *Vincent* requires the conclusion that the utility poles and conduits do not constitute a public forum for the purpose of cable transmission, the City may not suppress expression on those structures merely because it disagrees with the speaker's viewpoint. *See Perry Edu-*

*cation Association,* 460 U.S. at 46, 103 S.Ct. at 955. While an outright ban would be viewpoint neutral, *see Taxpayers for Vincent,* 104 S.Ct. at 2128–29, the City's action in the instant case creates an impermissible risk of covert discrimination based on the content of or the views expressed in the operator's proposed programing. *See Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 649, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981). *Vincent* does not support the City's attempt to single out one cable television company to be the one speaker it will permit to use public property for expressive purposes, while it forbids access for those purposes to all others.

Allowing a procedure such as the City's would be akin to allowing the government discretion to grant a permit for the operation of newspaper vending machines located on public streets only to the newspaper that the government believes "best" serves the community, a practice which we find clearly invalid. *See, e.g., Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666, 673–75 (11th Cir.1984) (striking down a license tax applicable to newspaper vending machines that gave the city council discretion to deny issuance of a license where the applicant failed to comply with pertinent ordinances and regulations). Instead, the City must content itself with uniformly applying to all applicants regulations tailored to minimize the burden on public resources and granting franchises to all cable operators who are willing to satisfy the City's legitimate conditions. We repeat, we do not in this opinion address a situation in which the City lacks the facilities to accommodate all who otherwise meet its conditions.

5. *Mandatory and Leased Access Channels and the City's Power to Restrict Access to the Cable Medium*

Amici suggest that the City's licensing procedure imposes no restriction on PCI's First Amendment rights. The mandatory access and leased access re-

quirements, amici assert, provide PCI with the opportunity to originate programming and to disseminate its message using the cable medium. The City merely would require that PCI use another's wires to transmit its programming. We disagree.

 We reject the contention that the City's access requirements provide complete protection for the exercise of expressive rights. Arranging programming for an entire cable television system entails engaging in a wide variety of protected activities.[10] Substituting the chance to share a few mandatory access and leased access channels with others for the right to operate an entire cable system necessarily diminishes PCI's opportunity to engage in such protected activities. A law allowing free expression in public parks only for a few minutes at 6 a.m. hardly provides an adequate replacement for the right to free, untrammeled debate in that forum. By the same reasoning, we cannot hold, solely on the basis of PCI's complaint, that the City's franchising program provides PCI with an adequate substitute for its right to operate a cable system. Nothing in this opinion is inconsistent with a city-operated franchise system that respects First Amendment rights. Congress must be presumed to have envisioned such a system.

 Our conclusion can be reached in another way. The cases recognize that an otherwise valid restriction on protected expression may be rendered invalid, if the modes of communication that remain are inadequate. *See, e.g., Taxpayers for Vincent,* 104 S.Ct. at 2132–33; *Heffron,* 452 U.S. at 654–55, 101 S.Ct. at 2567–68. But the reverse is not true. That is, an otherwise invalid restriction on protected activity is not saved by the availability of other means of expression. *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 76–77, 101 S.Ct. 2176, 2186–2187, 68 L.Ed.2d 671 (1981) (" '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' ") (quoting *Schneider v. New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939)); *accord Playtime Theaters, Inc. v. City of Renton,* 748 F.2d 527, 538 (9th Cir.1984); *NAACP, Western Region v. City of Richmond,* 743 F.2d 1346, 1355 & n. 8 (9th Cir.1984). The City's argument is hard to distinguish from an assertion that a law prohibiting Mr. X or Mrs. Y from publishing a newspaper is valid, so long as each is provided an adequate space to print his or her message in already existing newspapers. Obviously, such a law would be invalid. We conclude, therefore, that allow-

---

**10.** In addition to originating their own programming, cable television operators exercise considerable editorial discretion regarding what their programming will include. *See FCC v. Midwest Video Corp.,* 440 U.S. 689, 707 & n. 17, 99 S.Ct. 1435, 1445 & n. 17, 59 L.Ed.2d 692 (1979). Editorial judgment is entitled to First Amendment protection. *See, e.g., Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 257–58, 94 S.Ct. 2831, 2839–40, 41 L.Ed.2d 730 (1974). Undeniably, cable operators do transmit programs produced by others. To the extent an operator does so, however, we believe it would be treated for First Amendment purposes as would be theater owners, booksellers, and concert promotors. Their First Amendment protection is not diminished because they distribute or present works created by others. *See, e.g., Interstate Circuit, Inc. v. City of Dallas,* 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968) (movie theaters); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (booksellers); *Cinevision Corp. v. City of Burbank,* 745 F.2d 560 at 567–68 (concert promotors).

And PCI does not lose its First Amendment rights merely because its judgment is tempered by commercial considerations. *See Gannett Satellite Information Network v. Metropolitan Transp. Auth.,* 745 F.2d 767, 772 (2d Cir.1984) (sale of newspapers is protected by the First Amendment); *Cinevision Corp.,* 745 F.2d at 567 (promoting concerts for profit enjoys First Amendment protection); *see also Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 504 n. 11, 101 S.Ct. 2882, 2890 n. 11, 69 L.Ed.2d 800 (1981) (noting lower court's confusion of "the category of 'commercial speech' with the category of individuals who have a 'commercial interest' in protected speech."); *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 786 n. 23, 98 S.Ct. 1407, 1421 n. 23, 55 L.Ed.2d 707 (1978) ("It is too late to suggest 'that the dependence of a communication on the expenditure of money itself operates to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment.") (quoting *Buckley v. Valeo,* 424 U.S. 1, 16, 96 S.Ct. 612, 633, 46 L.Ed.2d 659 (1976)).

ing PCI access to another's channels is not the equivalent of providing it access to an audience by means of its own cable.

### C. *Conclusion*

We repeat the issue we undertook to resolve:

> Can the City, consistent with the First Amendment, limit access by means of an auction process to a given region of the City to a single cable television company, when the public utility facilities and other public property in that region necessary to the installation and operation of a cable television system are physically capable of accommodating more than one system?

Our answer is no, the City cannot.[11]

### V.

### ANTITRUST IMMUNITY

States, acting "as sovereigns," are immune from liability under the Sherman Act. *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). This immunity stems from principles of federalism: the Supreme Court was unwilling to attribute to Congress an unexpressed intent to restrict state authority to replace competition with regulation or public ownership. *See id.* at 350–52, 63 S.Ct. at 313–14.

Municipalities and other political subdivisions of the state, however, do not automatically share in the state's immunity. In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court held that a municipality could be sued under the antitrust laws for refusing to sell gas and water to residents living outside the city limits who would not also agree to purchase electricity from the city. A plurality of the Court advanced the view that a municipality's anticompetitive conduct is not shielded from antitrust scrutiny, unless the municipality acts "pursuant to [a] state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1136 (plurality opinion). The plurality emphasized that the state policy pursued by the municipality must be "clearly articulated and affirmatively expressed." *See id.* at 410, 98 S.Ct. at 1135 (plurality opinion). A majority of the Court confirmed the *Lafayette* plurality's opinion in *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 51, 102 S.Ct. 835, 840, 70 L.Ed.2d 810 (1982).[12]

---

**11.** As already mentioned, *see supra* p. 1400 n. 3, § 621(a)(1) of the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779, 2786, empowers a local authority to "award ... 1 or more franchises within its jurisdiction." To the extent that this provision authorizes the government to protect its interest in regulating disruption of public resources through a system of permits or franchises, *see id.* § 621(a)(2) (noting government's interest in promoting safety and in ensuring that the costs of installation and operation are borne by the cable operator); *see also id.* § 602(8) (defining "franchise" as an initial authorization (or a renewal thereof), whether designated as a franchise, license, permit, or otherwise), it passes muster under the principles announced here. But we cannot agree with the suggestion in the legislative history that the provision "grants to the franchising authority the discretion to determine the number of cable operators to be authorized to provide service in a particular geographic area." H.R.Rep. No. 934, 98th Cong., 2d Sess. 59, *reprinted in* 1984 U.S.Code Cong. & Ad.News 1984, p. 4655, 4696. A construction of such breadth would be invalid.

**12.** The *Boulder* case concerned itself only with the availability of injunctive relief. *Century Federal, Inc. v. City of Palo Alto,* 579 F.Supp. 1553, 1555 n. 6 (N.D.Cal.1984). Whether a majority of the Court would similarly curtail a municipality's state action immunity in a suit seeking treble damages remains unsettled. *See Lafayette,* 435 U.S. at 442–43, 98 S.Ct. at 1151–52 (Blackmun, J., dissenting); *see also Cantor v. Detroit Edison Co.,* 428 U.S. 579, 614 n. 6, 96 S.Ct. 3110, 3129 n. 6, 49 L.Ed.2d 1141 (1976) (Blackmun, J., concurring in judgment) (discussing availability of a defense based on the unfairness of holding a private party liable where the state's participation dominates a decision to adopt a restraint challenged under the antitrust laws and asserting that "unfairness" would be a defense only to the recovery of damages, not to a suit seeking injunctive relief). *See generally* P. Areeda, *Antitrust Law* ¶ 212.2b, at 48–49 (Supp.1982) (arguing that damages should not be available in antitrust suits brought against municipalities and suggesting that antitrust scrutiny of municipal actions may be more readily justified if damages are unavail-

Two questions confront us. The first is whether the City acted under a ."clearly articulated and affirmatively expressed" state policy displacing competition with regulation or monopoly in the area of cable television. The second question is whether our holding with respect to the First Amendment deprives the City, as PCI contends, of any state action immunity under the antitrust laws.

At the time of this appeal, we faced a third question: whether the state must actively supervise policies authorizing anticompetitive conduct by its municipalities. *See California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105–06, 100 S.Ct. 937, 943–44, 63 L.Ed.2d 233 (1980) (imposing requirement of active state supervision over policies authorizing *private* anticompetitive conduct); *Community Communications Co.*, 455 U.S. at 51 n. 14, 102 S.Ct. at 841 n. 14) (leaving open the question whether the active supervision requirement applies to *municipal* defendants as well). The Supreme Court has since answered this question negatively, *see Town of Hallie v. City of Eau Clair*, —— U.S. ——, 105 S.Ct. 1713, 1720–21, —— L.Ed.2d —— (1985), and therefore, we need not address it further.

### A. *"Clearly Articulated and Affirmatively Expressed" State Policy*

Following *Lafayette* and *Boulder*, this circuit has developed a two part test for

assessing the availability of municipal *Parker v. Brown* immunity.

To prove that a policy is clearly articulated and affirmatively expressed, the City must demonstrate not only the existence of a state policy to displace competition with regulation, but also that the legislature contemplated the kind of actions alleged to be anticompetitive.

*Golden State Transit Corp. v. City of Los Angeles*, 726 F.2d 1430, 1433 (9th Cir.1984); *e.g., Tom Hudson & Associates v. City of Chula Vista*, 746 F.2d 1370, 1373 (9th Cir. 1984).

The City's franchising process is authorized by Cal.Gov't Code § 53066 (West Supp.1984).[13] That provision is entirely permissive; it does not require or compel franchising or exclusive franchising, but merely provides that cities "may" license or franchise the construction of community antenna television systems using public property and easements. *See Century Federal, Inc. v. City of Palo Alto*, 579 F.Supp. 1553, 1556–57 (N.D.Cal.1984) (discussing section 53066).

■ PCI argues that a "clearly articulated and affirmatively expressed" state policy means a clear and express state policy to supercede the antitrust laws and that section 53066 does not reflect such a policy. PCI points out that the provision merely permits cities to franchise cable systems and to consider accepting consideration oth-

---

able). Because we conclude that the statutory authorization for the City's franchising scheme satisfies the *Boulder* test, we do not reach this issue.

**13.** In relevant part, section 53066 provides:

Any city or county or city and county in the state of California may ... authorize by franchise or license the construction of a community antenna television system.... The award of the franchise or license may be made on the basis of quality of service, rates to the subscriber, income to the city, county, or city and county, experience and financial responsibility of the applicant plus any other consideration that will safeguard the public interest, rather than a cash auction bid....

Any cable television franchise or license awarded ... pursuant to this section may authorize the grantee thereof to place wires, conduits and appurtenances for the community antenna television system along or across such public streets, highways, alleys, public properties, or public easements of said city or county or city and county.

Cal.Gov't Code § 53066 (West Supp.1984); *see also* Cal. Const. art. XI, § 9 (West Supp.1985) (authorizing municipal operation or regulation of public works to furnish inhabitants with, inter alia, means of communication); Cal.Gov't Code § 53066.1 (West Supp.1984) (deregulating cable television rates).

er than cash in awarding the franchise. Consequently, PCI contends, the City's determination to eliminate competition among cable operators by limiting the number of franchises it issues reflects *city* policy not *state* policy. We disagree.

In making this argument, PCI relies on the Supreme Court's decision in *Boulder*. There, the municipality passed an ordinance placing a moratorium on the plaintiff cable company's efforts to expand its service. The city planned to invite new companies to submit proposals for cable service. The plaintiff sued, inter alia, under the antitrust laws. 455 U.S. at 45–47, 102 S.Ct. at 837–839. The city was a "home rule" municipality, granted extensive powers of self-government by the state constitution. *Id.* at 43 & n. 1, 102 S.Ct. at 836 & n. 1. The question faced by the Court was whether the home rule provision in the state constitution alone afforded state action immunity to the city. The Court decided that it did not. The requirement of "a clearly articulated and affirmatively expressed state policy" is not satisfied "when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought." *Id.* at 55, 102 S.Ct. at 842.

PCI asserts that, like the home rule provision at issue in *Boulder,* the permissive stance taken by California with regard to cable franchising reflects mere neutrality with respect to whether cable should be competitive. The City "can choose to prescribe monopoly service, while ... another can elect free-market competition...." *Id.* at 56, 102 S.Ct. at 843. Both alternatives are comprehended by the power granted by the state. *Id.; see Grason Electric Co. v. Sacramento Municipal Utility District,* 526 F.Supp. 276, 278–79 (E.D.Cal.1981).

PCI's argument is not without force. We agree that the state has vested its

municipalities with discretion in exercising their delegated power to franchise cable television. We do not believe, however, that this fact strips the City of state action immunity.

To begin with, the present case differs from *Boulder*. The home rule provision at issue there had nothing to say about cable television regulation. *See* 455 U.S. at 55, 102 S.Ct. at 812 ("Nor can [the anticompetitive] actions be truly described as 'comprehended within the powers *granted,*' since the term, 'granted,' necessarily implies an affirmative addressing of the subject by the State. The State did not do so here...."). Here, the California legislature has *affirmatively addressed* the subject of cable television with a statute that is far more specific than that involved in *Boulder*. *See, e.g., Tom Hudson & Associates,* 746 F.2d at 1373–74; *Century Federal, Inc.,* 579 F.Supp. at 1557. Section 53066 marks a clear legislative determination to delegate control over cable television to local authorities. Furthermore, the legislature reaffirmed this determination when it passed section 53066.1, a measure that removed local authority to regulate rates charged by certain cable operators. With reference to local regulation of other aspects of cable television, the legislature found that

> [w]hile the development and the regulation of cable television is a matter of statewide concern, the Legislature finds and directs that the exercise of the police power of the State of California concerning cable television *should,* except as otherwise directed by the Legislature, *remain in the cities, counties, or cities and counties....*

Cal.Gov't Code § 53066.1(p) (West Supp. 1984) (statement of legislative finding and direction) (emphasis added).

Narrowly drawn, explicit delegation is not required. The Supreme Court has never held "that the challenged municipal conduct need be inescapably mandated by the

State." *Tom Hudson & Associates*, 746 F.2d at 1372; *see Town of Hallie*, at ——, 105 S.Ct. at 1718–19. The cases do not require "that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit." *Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138 (plurality opinion); *accord Springs Ambulance Service v. City of Rancho Mirage*, 745 F.2d 1270, 1273 (9th Cir.1984).

Were it otherwise, the specter of antitrust liability would unduly hamper the state's ability to allocate governmental authority between itself and its subdivisions. Restricted too would be its use of municipalities to regulate areas requiring flexibility and the exercise of wide discretion at the local level. *See Lafayette*, 435 U.S. at 416, 98 S.Ct. at 1138 (plurality opinion); *Century Federal, Inc.*, 579 F.Supp. at 1558. *See generally* Areeda, *Antitrust Immunity for "State Action" After* Lafayette, 95 Harv.L.Rev. 435, 445 n. 49 (1981). We are unwilling to impose these constraints.

Thus, we conclude that *Parker* immunity exists when we find " 'from the authority given a governmental entity to operate in a particular area[ ] that the legislature contemplated the kind of action complained of.' " *Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138 (plurality opinion) (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 532 F.2d 431, 434 (5th Cir.1976), *aff'd*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)); *e.g., Tom Hudson & Associates*, 746 F.2d at 1372–73. Put somewhat differently, in the past we have looked to "whether the action is a 'necessary or reasonable consequence of engaging in the authorized activity.' " *Catalina Cablevision Associates v. City of Tucson*, 745 F.2d 1266, 1269 (9th Cir.1984) (quoting *Gold Cross Ambulance & Transfer & Standby Service v. City of Kansas City*, 705 F.2d 1005, 1013 (8th Cir.1983)); *accord Springs*

*Ambulance Service*, 745 F.2d at 1273; *see Town of Hallie*, 105 S.Ct. at 1718.

We employed this approach in *Catalina Cablevision Associates*, 745 F.2d at 1266. There, the defendant city intended to issue one, nonexclusive cable license, reserving the right to issue other nonexclusive licenses later. Accordingly, the City granted the license to one company and denied a license to the plaintiff. The state statute authorizing cable licensing, Ariz.Rev.Stat.Ann. § 9–506 (West.1977), was, if anything, less specific than section 53066. *See Century Federal, Inc.*, 579 F.Supp. at 1557 n. 9. It merely provided that cities "may issue a license to any person" for the purpose of regulating the construction and operation of cable television systems and required that cities impose restrictions on the use of public streets and on the construction and maintenance of cable systems. *See Catalina Cablevision Associates*, 745 F.2d at 1268–69.

We observed that cable television systems, much like telephone and public utility systems, burden public resources and that the statute accordingly directed the licensing authority to "impose conditions, restrictions, and limitations" on the use of public streets and on the construction of cable television systems. However, we concluded that "the legislature necessarily contemplated that cities would limit the number of cable providers despite the anticompetitive effects that such action might have." *Id.* at 1269–70. Therefore, the statute afforded state action immunity to the city's decision to issue a single, nonexclusive license.

We see no reason to reach a different result in this case. Section 53066 expressly notes that cities "may authorize the [franchisee or licensee] to place wires, conduits, and appurtenances ... along or across streets, highways, alleys, public properties, or public easements," indicating the legislature's awareness that it was delegating regulatory authority to deal with the bur-

den placed on public resources by cable television. That some cities, to minimize the disruption of public resources, might limit the number of cable providers seems to us to constitute at least a reasonable consequence of their engaging in the authorized regulatory activity. This possibility surely was in the contemplation of the legislature when it enacted section 53066. Accordingly, we conclude that the City acted pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition with regulation.

B. *The Effect on the City's Claim of State Action Immunity of Holding That the First Amendment Bars the City's Effort to Limit the Number of Cable Operators*

■ We have already held that PCI adequately alleged a specific violation of the First Amendment. PCI contends that a finding of unconstitutionality in any respect entitles it to prevail on its antitrust claim as well. To the extent section 53066 authorizes the City to use its franchising process in an unconstitutional manner, PCI asserts, the statute cannot afford state action immunity to the City's anticompetitive franchising process. We reject this contention.

PCI's argument confuses two separate sets of purposes: the purposes served by the antitrust laws and the purposes served by the First Amendment. State action is immune from the antitrust laws merely because the state itself has decided to act.

*Hoover v. Ronwin*, —— U.S. ——, 104 S.Ct. 1989, 1998, 80 L.Ed.2d 590 (1984). Congress did not intend the Sherman Act to extend to the sovereign acts of state governments. *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943). The First Amendment, on the other hand, is directed at government, both federal and state. There is no more reason to subject the state to antitrust liability because of First Amendment violations than there would be, for example, to deprive it of a federal subsidy such as mass transit aid.

It makes no difference that here it is the City that is charged with the First Amendment violation. For antitrust purposes, it is the state that has acted. "Clear articulation" and "active supervision" are merely analytical tools used to determine whether acts carried out by municipalities and private entities are in fact the actions of the state. *See Hoover*, 104 S.Ct. at 1995–96. PCI has alleged a First Amendment claim. It has not alleged an antitrust claim. Each conclusion is compatible with the other.[14]

We reverse the district court's dismissal of PCI's First Amendment claim and affirm its dismissal of the antitrust claims and remand the case for further proceedings.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**14.** We note the Supreme Court's opinion in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), a case that involved a challenge to a state bar disciplinary rule banning lawyer advertising that had been incorporated as one of the rules of the Arizona Supreme Court. *See id.* at 355, 97 S.Ct. at 2694. The Court found that, to the extent it prohibited attorneys from advertising the availability and the terms of their legal services, the rule violated the First Amendment. *See id.* at 363–84, 97 S.Ct. at 2698–99. This conclusion, however, did not prevent the Court from finding that, as the ban was an affirmative command of the state supreme court, the state action exemption barred the plaintiffs' antitrust claim. *See id.* at 359–63, 97 S.Ct. at 2696–99. Although the Court did not discuss the interplay between the plaintiffs' constitutional claim and their antitrust claim, we see no reason not to reach the same result here.